Deanna K. Tanner, Esq. (Pa. Bar No. 60258)
Kacy C. Manahan, Esq. (N.J. Bar No. 275122018; Pa. Limited License)
*Pro Hac Vice Admission Pending*
**Delaware Riverkeeper Network**
925 Canal Street
7th Floor, Suite 3701
Bristol, PA 19007
215-369-1188 (Tel)
215-369-1181 (Fax)
deanna@delawareriverkeeper.org
kacy@delawareriverkeeper.org

## U.S. DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE RIVERKEEPER NETWORK, and the DELAWARE RIVERKEEPER, MAYA VAN ROSSUM, ) ) ) ) | |
| Plaintiffs, ) | |
| ) | COMPLAINT FOR |
| v. ) | DECLARATORY |
| ) | JUDGMENT |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY, ) | CASE NO.2:20-CV-3412 |
| ANDREW R. WHEELER, ) | |
| in his official capacity as Administrator ) | |
| of the United States Environmental ) | |
| Protection Agency, ) | |
| ) | |
| Defendants. ) | |

--------------------------------------------------

## **INTRODUCTION**

1.     Plaintiffs Delaware Riverkeeper Network, and the Delaware

Riverkeeper, Maya van Rossum, (collectively, "Plaintiffs") challenge the United

States Environmental Protection Agency's ("EPA's") and the Administrator of

the EPA, Andrew R. Wheeler's ("Administrator's") promulgation of the Clean Water Act Section 401 Certification Rule ("Certification Rule"), 85 Fed. Reg. 42,210 (July 13, 2020) (to be codified at 40 C.F.R. pt. 121). The Certification Rule is an overhaul of 40 C.F.R. Part 121, which contains EPA's regulations interpreting Section 401 of the Clean Water Act ("Section 401"), 33 U.S.C. § 1341.

2.      The Certification Rule eviscerates the ability of states, tribes, and interstate authorities to protect water quality from Federally-approved projects. This dramatic change in policy after nearly fifty years of cooperative federalism was spurred by President Trump's desire to mow down regulatory obstacles to fossil fuel extraction, transportation, and export. In this administration's mad rush to seize the "tremendous economic opportunities" of fossil fuel development and "promote private investment in the Nation's energy infrastructure," [1] Defendants have taken a reckless approach to rulemaking, resulting in a legally indefensible rule.

3.      The Certification Rule is an interpretive rule promulgated outside of Defendants' Congressionally-delegated authority. Rather than enacting regulations "necessary to carry out [their] functions under" the Clean Water Act, 33 U.S.C. § 1361, Defendants attempt to regulate the functions of states, tribes,

_____

[1] Exec. Order No. 13868, 84 Fed. Reg. 15,495 (Apr. 15, 2019).

interstate agencies, and Federal agencies and the role each playa in administering the Section 401 program.

4.     Throughout the rulemaking process, Defendants failed to analyze or even consider the on-the-ground impact the Certification Rule would have on water quality. This flies directly in the face of the Clean Water Act's objective, which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

5.     Defendants base the purported need to regulate on a paucity of data describing how Section 401 certification requests are handled nationwide, instead relying on a few high-profile projects, which ultimately would not have been certified even if the Certification Rule had been in effect during their review.

6.     The Certification Rule narrows the scope of the Section 401 program based on new substantive definitions for terms that are either already defined in the Clean Water Act, or have been defined pursuant to the Supreme Court's interpretation of the unambiguous text of the statute.

7.     In fact, the scope is so narrowed, that it renders Section 401 superfluous because it covers the same regulatory ground as the National Pollutant Discharge Elimination System ("NPDES") program in Section 402. *See* 33 U.S.C. § 1342.

8.     Defendants also fail to explain how a new regime likely to result in inadequate certification requests and increased certification denials will solve the problem of project proponents experiencing delays in obtaining Section 401 certificates.

9.     The Certification Rule imposes new substantive requirements beyond what is required by the statute to define what constitutes an adequate action on a certification request. These substantive requirements are then used in the Certification Rule to justify a Federal agency's finding that the certifying authority "failed to act" within the reasonable period of time, thereby waiving Section 401 certification authority. This setup allows Federal agencies to review certificates and conditions prior to adopting them as a part of the Federal license or permit, contrary to the requirements of the Clean Water Act.

10.     Defendants also deprive certifying authorities of their jurisdiction to enforce Section 401 certifications and conditions, vesting that power solely in the Federal agency that issued the license or permit.

11.     Finally, the Certification Rule strips neighboring jurisdictions of a protection provided by Section 401—the requirement that the Administrator determine whether a project subject to Section 401 may affect the water quality in a neighboring jurisdiction. This action is now discretionary under the Certification Rule, and the rule erroneously assumes that a certification is a

4

precondition to the imposition of conditions to protect a neighboring jurisdiction's water quality on a Federal license or permit.

12.     Defendants' Certification Rule violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the Clean Water Act, 33 U.S.C. §§ 1251–1388, and the Tenth Amendment of the United States Constitution, U.S. Const., amend X. For these reasons, Plaintiffs seek an order from this Court vacating and setting aside the Certification Rule.

## PARTIES

13.     Plaintiff Delaware Riverkeeper Network ("DRN") is a Pennsylvania non-profit organization with its principal place of business at 925 Canal Street, 7th Floor, Suite 3701, Bristol, Pennsylvania. It was established in 1988 and has more than 25,000 members. DRN's mission is to protect and restore the Delaware River, and its tributaries, habitats and resources. To achieve these goals, DRN organizes and implements stream bank restorations, a volunteer monitoring program, educational programs, environmental advocacy initiatives, recreational activities, and environmental law enforcement efforts throughout the entire Delaware River watershed—an area which includes portions of Pennsylvania, New York, New Jersey and Delaware—and on the national level when necessary to achieve its mission. DRN goes to court when necessary to ensure enforcement of environmental and related laws. DRN has been highly

active in litigation regarding fracked gas infrastructure, including but not limited to wellpad siting, compressor stations, liquefied natural gas ("LNG") export facilities and pipelines, whether FERC-licensed or state-regulated. DRN has challenged various approvals over interstate natural gas pipelines and been involved in other litigation to ensure protection of water quality and the local environment when natural gas and other pipelines are proposed. DRN staff and its network of volunteers also documents violations and other problems along the path of pipeline construction, and brings such issues to the attention of relevant government agencies. DRN also commissions experts to analyze and report on issues related to fracked gas development, including the economic harms to the Delaware River basin from such development, the environmental and health impacts of fracked gas development, the economic and environmental unsustainability of fracked gas development, and other related issues.

14.     DRN members include individuals concerned about the protection and restoration of the Delaware River, and its tributaries, habitats and resources. DRN's members are dedicated to preserving and improving the cultural, historic and environmental resources of the Delaware River watershed.

15.     The laws of Pennsylvania and DRN's articles of incorporation, bylaws, and Board of Directors authorize it to bring this action on behalf of itself and its members.

6

16.     Plaintiff the Delaware Riverkeeper, Maya van Rossum, is a full-time privately funded ombudsman responsible for the protection of the waterways in the Delaware River Watershed. Maya van Rossum advocates for the protection and restoration of the cultural, historical, ecological, recreational, commercial and aesthetic qualities of the Delaware River and its tributaries, habitats and resources. As the Delaware Riverkeeper, Ms. van Rossum serves on a number of the region's water quality committees, including the Delaware River Basin Commission's Water Quality Advisory Committee, and on New Jersey's Stormwater Focus Group. Ms. van Rossum also serves as a member of the Area Plan Committee and the Area Maritime Security Committee, both of which are committees of the United States Coast Guard, the Philadelphia Group.

17.     Maya van Rossum regularly visits the Delaware River for personal and professional reasons, and her use and enjoyment of the River will be significantly diminished by a reduction in regulatory oversight of Federal projects.

18.     The Delaware River is the longest undammed river east of the Mississippi. It flows for 330 miles from New York State, through Pennsylvania, New Jersey, and Delaware, into the Atlantic Ocean. The Delaware River watershed is 13,539 square miles and supplies drinking water to approximately five percent of the nation's population. The Delaware River region has been

7

subjected to the effects of the shale gas fracking boom, particularly through expansion of the natural gas pipeline network from the Marcellus Shale to the densely populated areas within the watershed and beyond. Environmental impacts of pipeline construction include land cover change, deforestation, sedimentation and erosion, water quality degradation, stream degradation, wetland loss, and air emissions. The Delaware River estuary, home to the federally-listed endangered Atlantic sturgeon, is also vulnerable to the siting of natural gas export facilities—in fact, an export facility in Gibbstown, New Jersey is currently moving through the federal permitting process.

19.    DRN's thousands of members, and Maya van Rossum, all enjoy the water quality and bucolic surroundings of the Delaware River, its tributaries and its watershed. DRN members boat, fish, canoe, bird watch, hike and participate in other recreational activities throughout the watershed. DRN's members will be harmed by the Rule's infringement on state authority to protect the Delaware River and its supporting environment. The Certification Rule is a deregulatory action that circumscribes the ability of the Delaware River watershed states (New York, New Jersey, Pennsylvania, and Delaware) to protect their waters beyond point source discharge regulations, creates a mechanism that allows Federal agency to deem a certification and/or its conditions "waived," deprives these states of their authority to enforce certification conditions, permits the

EPA to decline to analyze the effects of a discharge on a neighboring state, and limits a neighboring state's authority to impose additional conditions on a Federal license or permit. Because the Certification Rule strips the ability of states to comprehensively protect water resources from Federally licensed or permitted activities, the water resources of the Delaware River watershed are vulnerable to degradation. In addition, Plaintiffs' procedural interests are harmed by the Certification Rule because it limits the scope of a state's review, and thus plaintiffs will be deprived of information they otherwise would have received about the impact of Federally licensed or permitted activities.

20.     Defendant EPA is an agency of the United States government created in 1970 in part to "enhance and preserve the quality and value of the Nation's waters." EPA Order 1110.2 (Dec. 4, 1970). The mission of EPA is to protect human health and the environment by ensuring that: Americans have clean air, land, and water; national efforts to reduce environmental risks are based on the best available scientific information; Federal laws protecting human health and the environment are administered and enforced fairly, effectively, and as Congress intended; and environmental stewardship is integral to U.S. policies concerning natural resources, human health, economic growth, energy, transportation, agriculture, industry, and international trade, and these factors are similarly considered in establishing environmental policy. *See* Our

Mission   and   What   We   Do   |   About   EPA   |   US   EPA, https://www.epa.gov/aboutepa/our-mission-and-what-we-do (last visited June 11, 2020).

21.    Defendant Andrew R. Wheeler is the Administrator of EPA. Administrator Wheeler is responsible for the administration, operations, and activities of EPA. In his official capacity, Administrator Wheeler resides in Washington, DC. Administrator Wheeler is being sued in his official capacity.

22.    Defendant EPA, through its Administrator Defendant Andrew R. Wheeler, is responsible for administering the Clean Water Act. The Certification Rule was issued by EPA and signed by Administrator Wheeler.

## <u>JURISDICTION AND VENUE</u>

23.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 702 and 704. *See Nat'l Ass'n of Mfrs. v. Dept. of Defense*, 138 S. Ct. 617, 630 (2018) (finding that a rule promulgated under EPA's general rulemaking authority, 33 U.S.C. § 1361(a), does not fall within the scope of 33 U.S.C. § 1369(b)(1), which requires judicial review exclusively in the federal courts of appeals).

24.    The Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as 5 U.S.C. § 706.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are an agency and an officer of the United States and Plaintiffs including certain of DRN's members reside in this judicial district and will be imminently adversely impacted by the Certification Rule.

## **BACKGROUND**

### **The History of Federal Water Pollution Control Evinces a Prominent Role for State Authority.**

26.     The first comprehensive Federal law to address the nationwide problem of water pollution was the Federal Water Pollution Control Act ("FWPCA"), Act of June 30, 1948, c. 758, 62 Stat. 1155.

27.     The precursor to Section 401 first appeared as Section 21(b) of the Water Quality Improvement Act of 1970, Pub. L. No. 91-224, § 21(b), 84 Stat. 91, 108 (1970), which amended the FWPCA.

28.     That section read:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters of the United States, shall provide the licensing or permitting agency a certification from the State[2] in which the discharge originates or will originate . . . that there is reasonable assurance, as determined by the State or interstate agency that such activity will be conducted in a manner

---

[2] In some circumstances, the certifying authority would be the Secretary of Health Education and Welfare, or an interstate water pollution control agency.

which will not violate applicable water quality
standards.

*Id.*

29.    The section also provided that if the certifying authority "fails or
refuses to act on a request for certification, within a reasonable period of time
(which shall not exceed one year) after receipt of such request, the certification
requirements of this subsection shall be waived with respect to such Federal
application." *Id.*

**The Modern Clean Water Act Envisioned a Comprehensive Water Quality
Protection Scheme Involving both Federal and State Authority.**

30.    In 1972, Congress substantially amended the FWPCA. Pub L. 92-
500, 86 Stat. 816 (1972). These amendments constituted the modern-day Clean
Water Act. Congress' purpose in doing so was to "restore and maintain the
chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.
§ 1251(a).

31.    Section 301 of the Clean Water Act prohibits "the discharge of any
pollutant by any person" "[e]xcept as in compliance with this section and
sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title . . . ." 33 U.S.C.
§ 1311(a).

32.    "The term 'discharge of a pollutant' and the term 'discharge of
pollutants' each means (A) any addition of any pollutant to navigable waters

from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or floating craft." 33 U.S.C. § 1362(12).

33.    "The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

34.    "Navigable waters" is defined as the "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "Waters of the United States" is defined in more detail by regulation. *See* 33 C.F.R. § 328.3.

35.    A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

36.    Point source discharges are regulated through the Section 402 National Pollutant Discharge Elimination System ("NPDES") permitting program, *see* 33 U.S.C. § 1342, and the Section 404 dredge and fill permitting program. *See* 33 U.S.C. § 1344.

13

37.     Regarding nonpoint sources of pollution, the Clean Water Act states that "it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution." 33 U.S.C. § 1251(a)(7).

38.     Within that framework, Congress sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." 33 U.S.C. § 1251(b).

39.     Accordingly, Congress explicitly preserved state authority to regulate more stringently than the EPA in Section 510 of the Clean Water Act:

> Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent

14

limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

33 U.S.C. § 1370.

40.    Under § 518(e) of the Clean Water Act, EPA may "treat an Indian tribe as a state for purposes of" specified provisions of the Clean Water Act, including Section 401, if such tribe meets certain enumerated standards. 33 U.S.C. § 1377(e).

41.    By addressing both point and nonpoint source pollution, and utilizing the authorities of both the Federal and State governments, "[t]he 'major purpose' of the Amendments was 'to establish a *comprehensive* long-range policy for the elimination of water pollution.'" *City of Milwaukee v. Ill. & Mich.*, 451 U.S. 304, 318 (1981) (quoting S. Rep. No. 92–414, at 95). Thus, "in construing the Act, 'the guiding star is the intent of Congress to improve and preserve the quality of the Nation's waters. All issues must be viewed in the light of that intent.'" *Kennecott Copper Corp. v. Envtl. Prot. Agency*, 612 F.2d 1232, 1236 (10th Cir. 1979) (quoting *Am. Petroleum Institute v. Envtl. Prot. Agency*, 540 F.2d 1023, 1028 (10th Cir. 1976)).

**Section 401 of the Clean Water Act Was Enacted as a Bulwark to Prevent Federally-Approved Activities From Degrading Water Qualtiy.**

42.     Subsection 401(a)(1) of the Clean Water Act requires "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in *any discharge* into the navigable waters" to "provide the licensing or permitting agency a certification from the State [or other certifying authority] in which the discharge originates or will originate . . . that any such discharge will comply with the applicable provisions of sections [301, 302, 303, 306, and 307] of this title." 33 U.S.C. § 1341(a)(1) (emphasis added).

43.     "Discharge" is defined in the Clean Water Act as follows: "The term 'discharge' when used without qualification *includes* a discharge of a pollutant, and a discharge of pollutants." 33 U.S.C. § 1362(16) (emphasis added).

44.     Certifying authorities must "establish procedures for public notice in the case of all applications for certifications by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications." 33 U.S.C. § 1341(a)(1).

45.     Subsection 401(a)(1) provides that if the certifying authority "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application." *Id.*

16

46.    In addition, "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived a*s provided in the preceding sentence*. No license or permit shall be granted if certification has been denied by" the certifying authority. *Id.* (emphasis added).

47.    Subsection 401(a)(2) describes the appropriate procedure when a potential discharge may affect a neighboring jurisdiction other than that in which the potential discharge will originate. *See* 33 U.S.C. § 1341(a)(2).

48.    The Administrator must determine whether the potential discharge "may affect . . . the quality of the waters of any other State," and, if the Administrator so determines, they must notify that state within thirty days. *Id.*

49.    "If, within sixty days after receipt of such notification," the state "determines that such discharge will affect the quality of its waters so as to violate any water quality requirements," the state may notify the Administrator and the Federal agency that it objects to the issuance of the license or permit and request a public hearing. *Id.*

50.    Based on the evidence adduced at the hearing, the Federal agency "shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If imposition of conditions cannot insure such compliance such agency shall not issue such license or permit." *Id.*

17

51.    Subsection 401(a)(3) makes clear that the certification applies to both a Federal license or permit to construct a facility as well as any Federal license or permit to operate such facility, unless the certifying authority, based on information received from the Federal agency licensing or permitting the operation of the facility determines "that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections [301, 302, 303, 306, and 307 of the Clean Water Act] because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements." 33 U.S.C. § 1341(a)(3).

52.    Subsection 401(a)(4) governs facilities or activities for which a federal license or permit is required for construction, but *not* for operation, and allows the certifying authority to review the facility's or activity's proposed operation to determine whether it "will violate applicable effluent limitations or other limitations or other water quality requirements." 33 U.S.C. § 1341(a)(4).

53.    If so, the licensing or permitting agency may suspend the license or permit after opportunity for public hearing, until the certifying authority notifies the licensing or permitting agency that "there is reasonable assurance that such

18

facility or activity will not violate the applicable provisions of section [301, 302, 303, 306, or 307]" of the Clean Water Act. *Id.*

54.    Subsection 401(a)(5) allows a Federal license or permit to be revoked upon the entering of a judgment that the licensed or permitted facility or activity was "operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316 or 1317" of the Clean Water Act. 33 U.S.C. § 1341(a)(5).

55.    Subsection 401(a)(6) is a grandfathering provision. *See* 33 U.S.C. § 1341(a)(6).

56.    Subsection 401(b) provides that "[n]othing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements." 33 U.S.C. § 1341(b).

57.    That subsection also instructs the Administrator to provide relevant information concerning "applicable effluent limitations, or other limitations, standards, regulations, or requirements, or other water quality criteria" to Federal agencies and certifying authorities, and to "comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria" when requested to do so. *Id.*

58.     Subsection 401(c) authorizes the U.S. Army Corps of Engineers to permit the use of soil disposal areas by Federal licensees or permittees. 33 U.S.C. § 1341(c).

59.     Finally, subsection 401(d) governs the contents of a certification, directing certifying authorities to include conditions to protect water quality:

> Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a federal license or permit will comply with any applicable effluent limitations and other limitations, under section [301 or 302] of this title, standard of performance under section [306] of this title, or prohibition, effluent standard, or pretreatment standard under section [307] of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

> 33 U.S.C. § 1341(d).

**EPA's 1971 Regulations Provided Procedural Guidance to Certifying Authorities and Federal Agencies Without Modifying or Interpreting the Substantive Provisions of Section 401.**

60.     In 1971, prior to the enactment of the modern-day Clean Water Act, EPA promulgated regulations implementing Section 21(b) of the FWPCA. *See* 36 Fed. Reg. 22,487 (Nov. 5, 1971) (codified at 40 CFR Part 121). These regulations served as EPA's implementing regulations for Section 401 from 1971 until September 11, 2020.

61.   Those regulations provide that the contents of a certification must include a "statement that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards," a "statement of any conditions which the certifying agency deems necessary or desirable with respect to the discharge of the activity," and "[s]uch other information as the certifying agency may determine to be appropriate." 40 C.F.R. § 121.2(a)(3)–(5).

62.   Such certification is based on either information contained in the application to the Federal licensing or permitting agency, or any additional information provided to the certifying authority by the applicant in order for the authority to be able to make its "reasonable assurance" determination. *See* 40 C.F.R. § 121.2(a)(2); *see also* 40 C.F.R. § 121.3 (applications to the Federal licensing or permitting agency shall "include . . . such information relating to water quality considerations as may be agreed upon by the licensing or permitting agency and the Administrator").

63.   The certification requirement is waived upon either: "(a) Written notification from the State or interstate agency concerned that it expressly waives its authority to act on a request for certification; or (b) Written notification from the licensing or permitting agency to the Regional Administrator of the failure of the State or interstate agency concerned to act on

21

such request for certification within a reasonable period of time after receipt of such request, as determined by the licensing or permitting agency (which period shall generally be considered to be 6 months, but in any event shall not exceed 1 year)." 40 C.F.R. § 121.16.

64.     The regulations also provide for procedures to determine whether a potential discharge will affect more than one State, and procedures that apply when the EPA Administrator is the certifying authority, and circumstances under which an EPA regional administrator can advise a Federal licensing or permitting agency concerning water quality standards. *See* 40 C.F.R. Part 121 Subparts B–D.

**Supreme Court Precedent Makes Clear that States Have Broad Authority to Review and Place Conditions on Federally-Approved Activities in Order to Protect Water Quality.**

*PUD No. 1 of Jefferson County v. Washington Department of Ecology*

65.     In *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700 (1994), the Supreme Court interpreted the scope of Section 401 in the context of a certification that required a hydroelectric project to maintain a minimum stream flow to protect salmon and steelhead.

66.     The Court analyzed the plain language of Section 401 as a whole, noting that § 401(a) refers solely to a "discharge," while § 401(d) refers to the

"applicant," thus concluding that § 401(d) allows the certifying authority to impose conditions on the project in general. *Id.* at 711.

67.    The Court held that while § 401(a) "identifies the *category* of activities subject to certification—namely, those with discharges"—§ 401(d) "is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied." *Id.* at 711–12.

68.    Next, the Court pointed out that EPA's longstanding regulations reasonably and "expressly interpret § 401 as requiring the State to find that 'there is a reasonable assurance that the *activity* will be conducted in a manner which will not violate applicable water quality standards.'" *Id.* at 712 (quoting 40 C.F.R. § 121.2(a)(3)).

69.    In addition, based on the plain language and legislative history of the Clean Water Act, the Court held that "ensuring compliance with § 303 is a proper function of the § 401 certification" and that "state water quality standards adopted pursuant to § 303 are among the 'other limitations' with which a State may ensure compliance through the § 401 certification process." *Id.* at 712–13.

70.    "Accordingly, under the *literal terms of the statute*, a project that does not comply with a designated use of the water does not comply with the applicable water quality standards." *Id.* at 715 (emphasis added).

23

71.    The applicable water quality standards include "both the designated uses and the water quality criteria of the state standards." *Id.*

72.    The Court declined to speculate on "what additional state laws, if any, might be incorporated" by § 401(d)'s reference to "any other appropriate requirement of State law," but concluded that "at a minimum, limitations pursuant to state water quality standards adopted pursuant to § 303 are 'appropriate' requirements of state law." *Id.* at 713.

73.    Ultimately, the Court held that "pursuant to § 401, States may condition certification upon *any limitations necessary* to ensure compliance with state water quality standards or any other 'appropriate requirement of State law.'" *Id.* at 713–14 (emphasis added).

74.    In a concurring opinion, Justice Stevens emphasized that "[f]or judges who find it unnecessary to go behind the statutory text to discern the intent of Congress, this is (or should be) an easy case. Not a single sentence, phrase, or word in the Clean Water Act purports to place any constraint on a State's power to regulate the quality of its own waters more stringently than federal law might require." *Id.* at 723 (Stevens, J., concurring).

*S.D. Warren Co. v. Maine Board of Environmental Protection*

75.     In 2006, the Supreme Court examined the phrase "may result in any discharge into the navigable waters" as it appears in § 401(a)(1). *See S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370 (2006).

76.     The Court ruled that the term "discharge" as used in Section 401 is broader than the terms "discharge of a pollutant" and "discharge of pollutants," since the Clean Water Act provides that those terms are *included* in the meaning of "discharge." *Id.* at 375–76 (quoting 33 U.S.C. § 1362(16)).

77.     The Court concluded that "discharge" means a "flowing or issuing out," *id.* at 376, and that an "addition" is not required. *Id.* at 378–80.

78.     In so ruling, the Court emphasized that § 402 of the Clean Water Act, which specifically regulates discharges of pollutants, and Section 401 "are not interchangeable, as they serve different purposes and use different language to reach them." *Id.* at 380.

79.     Section 401 "recast preexisting law and was meant to 'continu[e] the authority of the State . . . to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State.'" *Id.* (alteration in original) (quoting S. Rep. No. 92–414, p. 69 (1971)).

80. Section 402, on the other hand, has a more "specific focus" and contains the "triggering statutory term . . . 'discharge of a pollutant,' . . . ." *Id.* at 380–81 (quoting 33 U.S.C. § 1362(12)).

81. The Court criticized petitioner's argument as "miss[ing] the forest for the trees," *id.* at 384, since the Clean Water Act "does not stop at controlling the 'addition of pollutants,' but deals with 'pollution' generally, which Congress defined to mean 'the man-made of man-induced alteration of the chemical, physical, biological, and radiological integrity of water." *Id.* at 385 (citation omitted) (first quoting 33 U.S.C. § 1251(b); and then quoting 33 U.S.C. § 1362(19)).

82. The Court listed the effects of the dam project at issue in the case, which included dried-out riverbeds, structures blocking fish passage, the destruction of fishing opportunities, and physical barriers to recreational access. The Court affirmed that "[c]hanges in the river like these fall within a State's legitimate legislative business, and the Clean Water Act provides for a system that respects the States' concerns." *Id.* at 386.

83. Finally, the Court quoted Senator Muskie to explain why Section 401 gives States broad "power to enforce 'any other appropriate requirement of State law,' by imposing conditions on federal licenses for activities that may

26

result in a discharge," *Id.* at 386 (citation omitted) (quoting 33 U.S.C. § 1341(d)).

> No polluter will be able to hide behind a Federal license or permit as an excuse for a violation of water quality standard[s]. No polluter will be able to make major investment in facilities under a Federal license or permit without providing assurance that the facility will comply with water quality standards. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of water quality requirements.

*Id.* (quoting 116 Cong. Rec. 8984 (1970)).

## Past EPA Guidance Documents Encourage States to Use Section 401 to Protect All Uses of Waters Within the State Using Any Law Related to Water Quality.

*EPA's 1989 Handbook*

84.    In 1989, EPA published a handbook to assist certifying authorities in drafting Section 401 certifications for wetlands. *See* Office of Water, U.S. Envtl. Prot. Agency, EPA 843-B-89-100, Wetlands and 401 Certification: Opportunities and Guidelines for States and Eligible Indian Tribes (April 1989) ("1989 Wetlands Guidance").

85.    In that handbook, EPA described the scope of the certifying authority's review under § 401(a) as broad, stating that "it is imperative for a State review to consider all potential water quality impacts of the project, both direct and indirect, over the life of the project." *Id.* at 22.

27

86.    As an example, the handbook cited a FERC hydroelectric project on the Susquehanna River in Harrisburg, Pennsylvania. "The impact considered [by the then Pennsylvania Department of Environmental Resources] were not just from the discharge initiating the certification review, but water quality impacts from the entire project." *Id.*

87.    EPA emphasized that "all of the potential effects of a proposed activity on water quality—direct and indirect, short and long term, upstream and downstream, construction and operation—should be a part of a State's certification review." *Id.* at 23.

88.    In describing the type of conditions that may be placed on a certification pursuant to § 401(d), EPA explained that "[t]he legislative history of the subsection indicates that the Congress meant for the States to impose whatever conditions on the certification are necessary to ensure that an applicant complies with all State requirements that are related to water quality concerns." *Id.* at 23.

89.    Citing conditions imposed by the State of Maryland to a fill project, EPA explained:

> While few of these conditions are based directly on traditional water quality standards, all are valid and relate to the maintenance of water quality or the designated use of the waters in some way. Some of the conditions are clearly requirements of State or local law related to water quality other than those promulgated

pursuant to the CWA sections enumerated in Section 401(a)(1). Other conditions were designed to minimize the project's adverse effects on water quality over the life of the project.

*Id.* at 24.

90.    With regard to § 401(a)(1)'s waiver provision, the 1989 Wetlands Guidance recognized the problem of a certification request potentially containing insufficient information, and advised States to promulgate regulations "link[ing] the timing for review to what is considered receipt of a complete application." *Id.* at 31.

91.    EPA further described States whose "regulations define the major components of a complete application" and provide timelines for "completeness" determinations. *Id.*

*EPA's 2010 Handbook*

92.    In 2010, EPA updated its Section 401 guidance. *See* Office of Wetlands, Oceans, and Watersheds, U.S. Envtl. Prot. Agency, *Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool for States and Tribes* (2010) ("2010 Handbook").

93.    Addressing the scope of Section 401, the 2010 Handbook explained that "Section 401 applies to any federal permit or license for an activity that may discharge into a water of the U.S." *Id.* at 18. "Once these thresholds are met, the scope of analysis and potential conditions can be quite broad." *Id.*

29

94.    Citing *PUD No. 1 of Jefferson County*, the 2010 Handbook directed that "the conditions and limitations included in the certification may address the permitted activity as a whole. Certification may address concerns related to the integrity of the aquatic resource and need not be specifically tied to a discharge." *Id.* at 23 (citing *PUD No. 1 of Jefferson Cty.*, 511 U.S. at 712).

95.    EPA stated that "[t]he granting of § 401 water quality certification to an applicant for a federal license or permit signifies that the state or tribe has determined that the proposed *activity and discharge* will comply with water quality standards as well as the other identified provisions of the CWA and appropriate requirements of state or tribal law." *Id.* at 8 (emphasis added).

96.    The 2010 Handbook makes clear that "while EPA-approved state and tribal water quality standards may be a major consideration driving § 401 decision, they are not the only consideration." *Id.* at 16.

97.    Accordingly, "[w]ater quality certifications . . . reflect not only that the licensed or permitted activity and discharge will be consistent with the specific CWA provisions identified in sections 401(a) and (d), but also with 'any other appropriate requirements of State [or Tribal] law.'" *Id.* at 21 (alteration in original) (quoting 33 U.S.C. § 1341(d)).

98.    An example of a "relevant consideration . . . is the existence of state or tribal laws protecting threatened and endangered species, particularly where

the species plays a role in maintaining water quality or if their presence is an aspect of a designated use. Also relevant may be other state and tribal wildlife laws addressing habitat characteristics necessary for species identified in a waterbody's designated use." *Id.*

99.    Another relevant consideration may be "protection of the cultural or religious value of waters expressed in state or tribal law . . . even when not included as part of a water quality standard." *Id.*

100.   The 2010 Handbook encouraged certifying authorities to develop their own regulations implementing the Section 401 process. *Id.* at 25–26.

101.   With regard to waiver, EPA explained that "[t]he amount of time allowed for action on a certification application is determined by the Federal agency issuing the license or permit, while the certifying agency determines what constitutes a 'complete application' that starts the timeframe clock." *Id.* at 11.

102.   The 2010 Handbook addressed the problem of when more information is needed from the applicant by the certifying authority and suggested either (1) requesting the applicant to withdraw their certification request and resubmit to the certifying authority, or (2) the certifying authority deny the request without prejudice, thereby allowing the applicant to submit another request with the missing information. *See id.* at 13.

31

103.   Regarding Section 401-related disputes, the 2010 Handbook divides disputes between state/tribal courts and Federal courts. *See id*. at 31, fig. 5.

104.   State or tribal courts have jurisdiction over whether the '[c]ertification decision [is] consistent with water quality standards; other enumerated CWA provision; and appropriate provisions of state or tribal law." *Id*.

105.   Federal courts have jurisdiction concerning the "[t]imeframe for automatic waiver of certification," "[r]e-certification needed due to changes in circumstances outlined in § 401(a)(3)," and "[w]hether threshold conditions required for 401 certification to apply are met (i.e., federal permit or license, discharge, water of the U.S.)." *Id*.

106.   The 2010 Handbook explains that Section 401 certification conditions may be enforced by the certifying authority, the Federal agency that issued the license or permit, or citizens via a citizen suit. *Id.* at 32–33.

**Executive Order 13868 Instructed the Administrator to Overhaul the Implementation of Section 401 in Order to Promote Private Interests in the Energy and Energy Infrastructure Sectors.**

107.   On April 10, 2019, President Trump issued Executive Order 13868, titled "Promoting Energy Infrastructure and Economic Growth." *See* Exec. Order No. 13868, 84 Fed. Reg. 15,495 (Apr. 15, 2019).

108. In Section 1 of the order, President Trump cites the increased domestic production of natural gas and the United States' status as a net exporter. *Id.* at 15,495.

109. Accordingly, the order explains, "[t]o enable the timely construction of the infrastructure needed to move our energy resources through domestic and international commerce, the Federal Government must promote efficient permitting processes and reduce regulatory uncertainties that currently make energy infrastructure projects expensive and that discourage new investment." *Id.*

110. Section 2 of the order announces that it is

the policy of the United States to promote private investment in the Nation's energy infrastructure through:

(a) efficient permitting processes and procedures that employ a single point of accountability, avoid duplicative and redundant studies and reviews, and establish clear and reasonable timetables;

(b) regulations that reflect best practices and best-available technologies;

(c) timely action on infrastructure projects that advance America's interests and ability to participate in global energy markets;

(d) increased regulatory certainty regarding the development of new energy infrastructure;

33

(e) effective stewardship of America's natural resources; and

(f) support for American ingenuity, the free market, and capitalism."

*Id.*

111. Section 3 of the Order directs the Administrator to "review[] section 401 of the Clean Water Act and EPA's related regulations and guidance to determine whether any provisions thereof should be clarified to be consistent with the policies described in section 2 of this order." *Id.* at 15,496.

112. Section 3 also directed the Administrator to issue new guidance to replace the 2010 Handbook, and to promulgate revised regulations interpreting Section 401. *Id.*

**EPA's 2019 Guidance Suggested that Certifying Authorities Cannot Make "Completeness" Determinations on Certification Requests and that Federal Agencies May be Permitted to Substantively Review Certification Conditions.**

113. On June 7, 2019, EPA issued a new guidance document interpreting Section 401. *See* U.S. Envtl. Prot. Agency, *Clean Water Act Section 401 Guidance for Federal Agencies, States and Authorized Tribes* (June 7, 2019) ("2019 Guidance").

114. In the 2019 Guidance, EPA asserted that "Congress enacted Section 401 of the CWA to provide states and authorized tribes with an important tool

to help protect water quality within their borders in collaboration with federal agencies." *Id.* at 1.

115. The 2019 Guidance focused on the timeline for certification, emphasizing that the statutory maximum allowable time to act on a certification request is one year. *Id.* at 2–3.

116. EPA asserted, however, that "[a]lthough the EPA's prior Section 401 guidance indicated that the timeline for action begins upon receipt of a 'complete application,' the CWA does not use that term and therefore its use in the EPA's guidance document as a regulatory trigger, without notice and comment rulemaking, is inappropriate." *Id.* at 3.

117. Concerning the scope of Section 401 review, the 2019 Guidance stated that such review should "be limited to an evaluation of potential water quality impacts." *Id.* at 4.

118. Concerning the scope of Section 401 certification conditions, the 2019 Guidance "recommends that conditions in a Section 401 certification be limited to ensuring compliance with the enumerated provisions of the CWA and other appropriate state or tribal water quality requirements." *Id.*

119. The 2019 Guidance suggested that, if a certifying authority takes an action outside the scope of Section 401, "federal permitting agencies should work with their Office of General Counsel and the EPA to determine whether a

permit or license should be issued with those conditions or if waiver has occurred." *Id.*

120.   The 2019 Guidance also made clear that a certifying authority's need for additional information should not toll the maximum one-year review period, and that a certification decision should be based on the application materials submitted to the Federal permitting or licensing agency. *Id.* at 4–5.

**EPA's New Rule Deprives States of Their Authority to Protect Water Quality, Directly Contradicts Section 401, and Flies in the Face of Nearly Fifty Years of Cooperative Federalism.**

*The Proposed Certification Rule*

121.   On August 22, 2019, Defendants published a proposed rule overhauling its regulations in 40 C.F.R. Part 121, which govern the implementation of Section 401. *See* Updating Regulations on Water Quality Certification, 84 Fed. Reg. 44,080 (Aug. 22, 2019).

122.   In the preamble to the proposed rule, Defendants described an information-gathering process that began in the summer of 2018 after Defendants sought input from the Environmental Council of the States, the Association of Clean Water Administrators, the Association of State Wetlands Managers, the National Tribal Water Council, and the National Tribal Caucus. *Id.* at 44,082.

36

123.   Several meetings took place and Defendants received correspondence during the Fall of 2018 and Spring of 2019. *Id.*

124.   After President Trump issued E.O. 13868, Defendants explained, rather than issuing "a notice soliciting public comment on whether the section 401 certification process would benefit from a rulemaking" as planned in 2018, it decided instead to issue the proposed rule. *Id.*

125.   In April and May of 2019, Defendants began "formal consultation efforts with states and tribes regarding provisions that require clarification within section 401 of the CWA and related federal regulations and guidance." *Id.*

126.   During this time, Defendants also received input from industry groups. *Id.* at 44,083.

127.   Defendants drafted the proposed rules based on this input and solicited comments thereafter from the public for a sixty-day period. *Id*. at 44,080.

128.   The proposed rule completely rewrote 40 C.F.R. Part 121 and introduced strict procedural and substantive standards to govern Section 401 certifications.  *See id*. at 44,119–22.

129.   The proposed rule: dictated what items constitute a complete certification request sufficient to trigger the maximum one-year review period;

narrowed a certifying authority's review to the effects of a point source discharge only; limited the legal authorities that could be used by a certifying authority to approve, deny, or condition a certification; treated a non-compliant certification as a waiver; vested the power of enforcement with the Federal agency; and made the determination as to whether an activity may affect a neighboring jurisdiction entirely discretionary. *See id.*

130.   Along with the proposed rule, EPA provided an economic analysis document. *See* U.S. Envtl. Prot. Agency, Economic Analysis for the Proposed Clean Water Act Section 401 Rulemaking (Aug. 2019) ("2019 Economic Analysis").

131.   Plaintiffs submitted their comments concerning the proposed rule on October 21, 2019, urging Defendants not to enact the Certification Rule as proposed. *See* Delaware Riverkeeper Network & Maya van Rossum, the Delaware Riverkeeper, Comment Letter on Proposed Section 401 Water Quality Certification Regulations (Oct. 21, 2019).

132.   The Environmental Council of the States commented and requested that Defendants rely on state regulations and procedures to determine when the "reasonable period of time" should begin. *See* Envtl. Council of the States, Comment Letter on Proposed Section 401 Water Quality Certification Regulations (Oct. 21, 2019).

133. The Association of Clean Water Administrators submitted comments expressing concern that the proposed Certification Rule improperly diminished states' role in the Section 401 process. *See* Ass'n of Clean Water Adm'rs, Comment Letter on Proposed Section 401 Water Quality Certification Regulations (Oct. 21, 2019).

134. The Association of State Wetland Managers submitted comments asking Defendants to withdraw the proposed rule and start again based on, among other issues, a rushed rulemaking process and the proposed rule's erosion of state authority. *See* Ass'n of State Wetland Managers, Comment Letter on Proposed Section 401 Water Quality Certification Regulations (Oct. 21, 2019).

135. The National Tribal Water Council commented in opposition to the proposed Certification Rule due to its weakening of environmental protections and limitation of tribal authority, and requested additional consultation with Defendants. *See* Nat'l Tribal Water Council, Comment Letter on Proposed Section 401 Water Quality Certification Regulations (Sept. 25, 2019).

*The Final Certification Rule*

136. On July 13, 2020, Defendants promulgated the Certification Rule. *See* Certification Rule, 85 Fed. Reg. at 42,210.

137. Along with the final Certification Rule, Defendants made available an updated economic analysis. *See* U.S. Envtl. Prot. Agency, *Economic Analysis*

*for the Clean Water Act Section 401 Certification Rule* (May 28, 2020) ("2020 Economic Analysis").

138.   EPA also prepared summary reports on consultation with state and local governments as well as tribal consultation and engagement. *See* Office of Water, U.S. Envtl. Prot. Agency, *Summary Report on Consultation with State and Local Governments for the Clean Water Act Section 401 Certification Rule* (May 11, 2020) ("State & Local Gov't Consultation Summary"); Office of Water, U.S. Envtl. Prot. Agency, *Summary Report of Tribal Consultation and Engagement for the Clean Water Act Section 401 Certification Rule* (May 11, 2020) ("Tribal Consultation Summary").

139.   The final Certification Rule has five subparts: A—general definitions; B—certification procedures; C—other jurisdictions; D—certification by the Administrator; and E—consultations.

140.   Subpart A, or § 121.1, 85 Fed. Reg. at 42,285, contains fourteen definitions. Of particular interest are definitions for "certification request," "discharge," "reasonable period of time," and "water quality requirements."

141.   Subpart B, *id.*, purports to set "procedures" for Section 401 certification, but includes several substantive requirements that alter the meaning of Section 401.

142.    Section 121.3, *id*., describes the scope of a Section 401 certification as "limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements."

143.    Section 121.5, *id*., contains an expanded definition of a "certification request," listing the items that must be included in a formal request, and, together with the procedures of § 121.6, 85 Fed. Reg. at 42,285–86, defines the action that will start the clock on the "reasonable period of time" for the certifying authority to review.

144.    Section 121.7, 85 Fed. Reg. at 42,286, provides that an "action on a certification request" must be within the "scope of certification" as defined in § 121.3, must be completed within the "reasonable period of time" as defined in § 121.6, and must comply with Section 401 of the Clean Water Act. It also sets out the statements to be included in a valid action on a certification request.

145.    Section 121.8, 85 Fed. Reg. at 42,286, provides that a project proponent may continue to submit certification requests after receiving a denial from a certifying authority.

146.    Section 121.9, *id.* defines a "waiver" of certifying authority as an express written notification, or as a "failure or refusal to act on a certification request," which includes a failure to act within the "reasonable period of time" or to comply with § 121.7. It also allows individual conditions of a certification

41

to be "waived" for failure to comply with § 121.7. The Federal agency is the entity that determines whether a waiver has occurred.

147.   Section 121.10, 85 Fed. Reg. at 42,286, reiterates that only certification conditions that satisfy the requirements of § 121.7 will be incorporated into the Federal license or permit.

148.   Section 121.11, 85 Fed. Reg. at 42,286–87, allows a certifying authority to inspect the facility or activity to ensure compliance with the certification, but entrusts the Federal agency with the authority to enforce certification conditions.

149.   Subpart C, also known as § 121.12, 85 Fed. Reg. at 42,287, interprets the Administrator's duties under Section 401(a)(2) of the Clean Water Act as discretionary, setting up an optional procedure by which a jurisdiction that may be affected by a discharge can provide input on the project and possibly cause the Federal agency to add conditions to the certifying authority's certificate.

150.   Subpart D, including sections 121.13, 121.14, and 121.15, 85 Fed. Reg. at 42,287, govern the Administrator's procedures when they are the certifying authority.

151.  Subpart E, also known as § 121.16, *id.*, provides that the Administrator shall provide Federal agencies, certifying authorities, and project proponents with information concerning water quality requirements.

**The Certification Rule is Arbitrary and Capricious and Contrary to the Text, Structure, and Overarching Purpose of the Clean Water Act.**

*Congress Did Not Delegate to Defendants the Authority to Interpret Section 401 Outside of Defendants' Own Functions Within That Section.*

152.  Defendants cite to §§ 304(h), 401, and 501 of the Clean Water Act for their authority to promulgate the Certification Rule. Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. at 42,210.

153.  Section 304(h) states that "[t]he Administrator shall, within one hundred and eighty days from October 18, 1972, promulgate guidelines establishing test procedures for the analysis of pollutants that shall include the factors which must be provided in any certification pursuant to section [401] of this title or permit application pursuant to section [402] of this title." 33 U.S.C. § 1314(h).

154.  Section 304(h) has no connection to the content of the Certification Rule, and clearly speaks to the promulgation of specific test procedures for the analysis of pollutants, rather than Section 401 certification procedures. In fact, Defendants recently proposed a rule under this section which dealt specifically with testing procedures for the analysis of pollutants. *See* Clean Water Act

Methods Update Rule for the Analysis of Effluent, 84 Fed. Reg. 56,590 (proposed Oct. 22, 2019) (to be codified at 40 C.F.R. Part 136).

155.   Section 401, in turn, does not contain any express delegation of rulemaking authority to the Administrator. It does, however, describe several functions of the Administrator within the Section 401 program, including:

- Acting as the certifying authority "[i]n any case where a State or interstate agency has no authority to give such a certification . . . ." 33 U.S.C. § 1341(a)(1).

- Determining whether "a discharge may affect . . . the quality of the waters of any other State" besides the state where the discharge originates, notifying the other State, and submitting their evaluation and recommendations at any hearing held by the Federal agency at the request of the other State. 33 U.S.C. § 1341(a)(2).

- Providing upon request by the Federal agency, certifying authority, or project proponent "any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria" and commenting when requested "on any methods to comply with such limitations, standards, regulations, requirements, or criteria." 33 U.S.C. § 1341(b).

44

156.   Finally, § 501 of the Clean Water Act states that "[t]he Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter." 33 U.S.C. § 1361(a).

157.   Thus, Defendants are authorized to prescribe such regulations as are necessary to carry out their functions as they appear in Section 401.

158.   When a "statute gives an agency broad power to enforce all provisions of the statute," that authority is clearly granted. *Gonzales v. Oregon*, 546 U.S. 243, 258–59 (2006). Language such as "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter," 47 U.S.C. § 201(b), or a delegation of authority to prescribe such regulations as "are necessary or proper to effectuate the purposes of this subchapter," 15 U.S.C. § 1604, are examples of such broad powers. *See Gonzales*, 546 U.S. at 258–59.

159.   "When Congress chooses to delegate a power [beyond the statute's specific grants of authority], it does so not by referring back to the administrator's functions but by giving authority over the provisions of the statute he is to interpret." *Id.* at 264–65 (interpreting 21 U.S.C. § 871(b), which reads: "The Attorney General may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this chapter.").

45

160.   Accordingly, Defendants are authorized to promulgate regulations necessary to carry out their functions under Section 401, which include: (1) acting as the certifying authority when no state, tribe, or interstate agency is authorized to do so; (2) determining when a neighboring jurisdiction may be affected by a discharge subject to Section 401 and assisting in the hearing process if the neighboring jurisdiction chooses to object; and (3) providing technical information to certifying authorities, Federal agencies, and project proponents.

161.   Defendants are therefore *not* authorized to promulgate regulations governing the certifying authorities' or Federal agencies' functions under Section 401.

162.   The Certification Rule includes provisions relating directly to the Administrator's functions, *see* §§ 121.12–121.16, and these portions of the Certification Rule are within Defendant's scope of regulatory authority.

163.   For these reasons, §§ 121.1–121.11 are in excess of statutory jurisdiction, authority or limitations, and must be set aside. *See* 5 U.S.C. § 706(2)(C).

*Defendants Ignored the Certification Rule's Potential Effects on Water Quality.*

164.   The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

165.   Congress also sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use (including restoration, preservation, and enhancement) of land and water resources . . . ." 33 U.S.C. § 1251(b).

166.   Despite this Congressional mandate, Defendants failed to put forth any analysis of how promulgation of the Certification Rule will impact water quality.

167.   Defendants "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc., v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983), which happens to be the primary purpose of the Clean Water Act—whether the Certification Rule will improve or degrade water quality.

168.   Thus, the Certification Rule is arbitrary, capricious, and not in accordance with law. *See id.*; *see also* 5 U.S.C. § 706(2)(A).

*Defendants Failed to Adequately Justify this Dramatic Change in Nearly Fifty-Year-Old Policy.*

169. Since the modern Clean Water Act was enacted in 1972, Defendants, states, and tribes have understood that Section 401 recognizes the broad power of certifying authorities to regulate water quality within their borders beyond the scope of the Clean Water Act itself.

170. The Certification Rule is a "deregulatory action," *see* Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. at 42,282, which curtails that authority by limiting the scope of a certifying authority's review, *see* § 121.3, defining the contents of a reviewable certification request sufficient to trigger the "reasonable period of time", *see* § 121.5, and subjecting certifications and conditions to the review of Federal agencies. *See* §§ 121.7, 121.9, 121.10.

171. Defendants cite Executive Order 13868's policy objective of "encourag[ing] greater investment in energy infrastructure in the United States by promoting efficient federal licensing and permitting processes and reducing regulatory uncertainty" as a reason for promulgating the Certification Rule. Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. at 42,211.

172. Defendants also assert that "litigation over the section 401 certifications for several high-profile infrastructure projects have highlighted the need for the EPA to update its regulations to provide a common framework for consistency with CWA section 401 and to give project proponents, certifying

48

authorities, and federal licensing and permitting agencies additional clarity and regulatory certainty." *Id.*

173.   Under the APA, Defendants must "examin[e] 'the relevant data' and articulate[] 'a satisfactory explanation' for [their] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

174.   In its 2020 Economic Analysis, EPA describes the "baseline scenario" that compelled it to take this deregulatory action. In that analysis, EPA noted that "[a]lthough a few high profile certification denials are part of the factual and administrative record for this rulemaking, and EPA has considered those facts during the rulemaking process, the EPA has not relied on these facts as the sole or primary basis for this rulemaking." 2020 Economic Analysis at 8.

175.   According to EPA, these high-profile certification denials "demonstrate that there is existing confusion about the timeline and scope of section 401 under the 1971 certification regulations, which has led to project delays and increased project costs." 2020 Economic Analysis at 7.

176.   EPA acknowledged that "data to quantify the economic effects of denials are limited," yet cited to an article published in a law journal for the proposition that "recurring denials of FERC-approved natural gas pipelines may

affect transportation of natural gas and could have an effect on the reliability of gas-fired electric generators." 2020 Economic Analysis at 13 (citing Steven A. Weiler & Marcia A. Stanford, *New York's Denial of Water Quality Certification for Three FERC-Authorized Pipelines: Flagrant Fiat or Valid Veto?*, 39 Energy L.J. 503 (2018)).

177.   Without citing any data on the number of certifications denied due to "information that is beyond the scope of certification," EPA concludes in its Economic Analysis that the narrowed scope of certification in the Certification Rule "may reduce" those denials. 2020 Economic Analysis at 22.

178.   As an initial matter, a "reduction" in denials outside the newly-defined "scope" is not possible, since the narrowed scope was not in existence prior to the Certification Rule.

179.   In addition, of the five example cases listed in its Economic Analysis, only one certification was denied for reasons outside the new Certification Rule's scope. *See* 2020 Economic Analysis at 32–33.

180.   As explained in paragraphs 164–168 of this Complaint, *supra*, Defendants also failed to analyze the impacts of a narrowed Section 401 scope on water quality, which may have shed light on whether the current practice of certifying agencies is actually protective of water quality, or if Section 401 is being improperly wielded for non-water-quality purposes.

181.   Thus, Defendants have failed to make a rational connection between the facts found and the decision to narrow the scope of Section 401 certifications, rendering §§ 121.1(f), 121.1(n), and 121.3 of the Certification Rule arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *see also Dep't of Commerce*, 139 S. Ct. at 2569.

*Sections 121.1(f), 121.1(n), and 121.3 of the Certification Rule Narrow the Scope of Certification Contrary to the Plain Text of the Clean Water Act and Supreme Court Precedent.*

182.   "Discharge" is defined in the Certification Rule as "a discharge from a point source into a water of the United States." Certification Rule § 121.1(f).

183.   The Clean Water Act provides that "[t]he term 'discharge' when used without qualification *includes* a discharge of a pollutant, and a discharge of pollutants." 33 U.S.C. § 1362(16) (emphasis added).

184.   "Point source" is defined in the statute as "any discernible, confined and discrete conveyance . . . from which *pollutants* are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added).

185.   Section 401 of the Clean Water Act is triggered when a project proponent applies "for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which

51

may result in *any discharge* into the navigable waters . . . ." 33 U.S.C. § 1341(a)(1).

186.  Section 401(a)(1) requires that a certification state "any such discharge will comply with the applicable provisions of sections [301, 302, 303, 306, and 307] of this title."

187.  The Supreme Court held in *S.D. Warren* that the term "discharge" by itself is broader than the statutory term "discharge of pollutants" and that the "ordinary or natural meaning" of discharge is "a 'flowing or issuing out.'" 547 U.S. at 376 (first quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994); and then quoting Webster's New International Dictionary 742 (2d ed. 1954)).

188.  The Court specifically reasoned that in the NPDES program, the "triggering statutory term . . . is not the word 'discharge' alone, but 'discharge of a pollutant,' a phrase made narrower by its specific definition requiring an 'addition' of a pollutant to the water." *Id.* at 380–81 (quoting 33 U.S.C. § 1362(12)).

189.  This holding was based on an interpretation of the statutory language alone, and the Supreme Court did not find that § 401 was ambiguous. In fact, the Court found that its definition of "discharge" was the "plain and ordinary meaning" of the term. *Id.* at 377.

190.   Thus, to the extent that Defendants have the authority to interpret Section 401 beyond their own functions, the Certification Rule conflicts with the Supreme Court's analysis of the unambiguous statutory language, and is not entitled to deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–86 (2005).

191.   Similarly, the term "discharge from a point source" as used in the Certification Rule makes narrower the term "discharge" by requiring a "discernible, confined and discrete conveyance . . . from which *pollutants* are or may be discharged." 33 U.S.C. § 1362(14).

192.   Defendants' narrowing of the term "discharge" to point source discharges is contrary to the plain text of the statute and Supreme Court precedent, which violates the Clean Water Act, is short of statutory right, 5 U.S.C. § 706(2)(C), and is otherwise not in accordance with law, *Id.* § 706(2)(A).

193.   "Water quality requirements" is defined in the Certification Rule as "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States." Certification Rule § 121.1(n)

194.   Section 401(a)(1) requires that a certification state that a discharge "will comply with the applicable provisions of sections [301, 302, 303, 306, and 307] of this title."

195.   By its plain language, § 401(a)(1) requires that a certifying agency ensure compliance with § 303 of the Clean Water Act, the section that governs state water quality standards.

196.   State water quality standards "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based on such uses." 33 U.S.C. § 1313(c)(2)(A).

197.   Water quality standards must "protect the public health or welfare, enhance the quality of water and serve the purposes" of the Clean Water Act, "taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." *Id.*

198.   States first establish "designated uses" for particular water bodies, then set specific "criteria" to protect those uses. 40 C.F.R. §§ 131.10, 131.11.

199.   Criteria are "elements of State water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." 40 C.F.R. § 131.3(b).

200.   In addition, EPA's antidegradation policy, which was incorporated into the Clean Water Act in 1987, *see* 33 U.S.C. § 1313(d)(4)(B), essentially prevents states from allowing water quality to degrade below specified levels. *See* 40 C.F.R. § 131.12.

201.   Section 401(d) of the Clean Water Act directs the certifying authority to include limitations and requirements

> necessary to assure that any *applicant* for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section [301 or 302] of this title, standard of performance under section [306] of this title, or prohibition, effluent standard, or pretreatment standard under section [307] of this title, and with any other appropriate requirement of State law set forth in such certification . . . .

> 33 U.S.C. § 1341(d) (emphasis added).

202.   The Supreme Court held in *PUD No. 1 of Jefferson County* that because § 401(d) "allows States to impose limitations to ensure compliance with § 301 of the Act," and "[s]ection 301 in turn incorporates § 303 by reference, . . . state water quality standards adopted pursuant to § 303 are among the 'other limitations' with which a State may ensure compliance through the § 401 process." 511 U.S. at 712–13.

203.   This holding was based on an interpretation of the statutory language alone, and the Supreme Court did not find that § 401(d) was ambiguous. *See id.*

55

204.   Thus, to the extent that Defendants have the authority to interpret Section 401 beyond their own functions, the Certification Rule conflicts with the Supreme Court's analysis of the unambiguous statutory language and is not entitled to deference. *See Brand X Internet Servs.*, 545 U.S. at 982–86.

205.   The enforcement of water quality standards, however, is not achieved solely through limitations on point source discharges.

206.   As explained by the Supreme Court in *PUD No. 1 of Jefferson County*, the plain language of § 401(d) "expands the State's authority to impose conditions on the certification of a project" and "refers to the compliance of the applicant, not the discharge." 511 U.S. at 711.

207.   "[U]nder the literal terms of the statute, a project that does not comply with a designated use of the water does not comply with applicable water quality standards." *Id.* at 715.

208.   The Supreme Court has concluded, based on the unambiguous language of the statute, that a "certification requirement that an applicant operate the project consistently with state water quality standards—i.e., consistently with the designated uses of the water body and the water quality criteria—is both a 'limitation' to assure 'compl[iance] with . . . limitations' imposed under § 303, and an 'appropriate' requirement of state law." *Id.*

209.   This holding was based on an interpretation of the statutory language alone, and the Supreme Court did not find that § 401(d) was ambiguous. *See id.*

210.   Thus, to the extent that Defendants have the authority to interpret Section 401 beyond their own functions, the Certification Rule conflicts with the Supreme Court's analysis of the unambiguous statutory language and is not entitled to deference. *See Brand X Internet Servs.*, 545 U.S. at 982–86.

211.   The Certification Rule improperly limits the scope of Section 401 to end-of-pipe limitations on point sources, while the plain language of that section and Supreme Court precedent makes abundantly clear that a certifying authority may deny a certification or impose conditions based on the effect that the federally licensed or permitted activity as a whole may have on water quality.

212.   The Certification Rule's definition of "water quality requirements" in § 121.1(n) violates the Clean Water Act, is short of statutory right, 5 U.S.C. § 706(2)(C), and is otherwise not in accordance with law, *Id.* § 706(2)(A).

213.   By incorporating the terms defined in §§ 121.1(f) and (n), § 121.3 of the Certification Rule violates the Clean Water Act, is short of statutory right, 5 U.S.C. § 706(2)(C), and is otherwise not in accordance with law, *Id.* § 706(2)(A).

*The Narrowed Scope of Section 401 Certification in the Certification Rule Renders Section 401 Duplicative of Section 402, and Therefore Superfluous.*

214.   Section 121.3 of the Certification Rule provides that "[t]he scope of a Clean Water Act section 401 certification is limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements."

215.   A "discharge" is defined in § 121.1(f) as "a discharge from a point source into a water of the United States."

216.   "Water quality requirements" are defined in section 121.1(n) as "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States."

217.   Section 402 of the Clean Water Act, also known as the NPDES program, allows the Administrator (or an authorized state or tribe) to "issue a permit for the discharge of any pollutant . . . upon condition that such discharge will meet . . . all applicable requirements under sections [301, 302, 306, 307, 308, and 403] of this title . . . ." 33 U.S.C. § 1342(a)(1).

218.   Section 301, in turn, requires NPDES permits to include "any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, *established pursuant to any*

*State law or regulations* (under authority preserved by section 1370 of this title) . . . ." 33 U.S.C. § 1311(b)(1)(C) (emphasis added).

219.   Thus, the Clean Water Act imposes an independent obligation for an NPDES permitting authority to include state or tribal regulatory requirements for point source discharges into waters of the United States. *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1301 (1st Cir. 1996) (citing *Roosevelt Campobello Int'l Park Comm'n v. U.S. Envtl. Prot. Agency*, 684 F.2d 1041, 1056 (1st Cir. 1982)).

220.   Accordingly, the scope of a certifying authority's Section 401 authority under Defendants' Certification Rule is nearly identical to the scope of National Pollutant Discharge Elimination System ("NPDES") program under Section 402 of the Clean Water Act, rendering Section 401 superfluous.

221.   The Supreme Court has explained that "the canon against surplusage is strongest" when another part of a statutory scheme would be rendered superfluous. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

222.   The Supreme Court has also made clear in its analysis of Section 401 that it is "not interchangeable" with § 402, because the sections "serve different purposes and use different language to reach them." *S.D. Warren*, 547 U.S. at 380.

59

223.   For these reasons, § 121.3 of the Certification Rule is arbitrary, capricious, an abuse of discretion, and is otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

*Sections 121.5 and 121.6 of the Certification Rule Creates a One-Size-Fits All Definition of a "Certification Request," Depriving Certifying Authorities of the Ability to Determine When an Application is Complete for Review.*

224.   Section 121.5 of the Certification Rule is cross-referenced by § 121.1(c) as containing the definition of "certification request."

225.   Section 121.5(b) provides the items to be included in a certification request for an individual license or permit and states that such request shall:

> (1) Identify the project proponent(s) and a point of contact;
>
> (2) Identify the proposed project;
>
> (3) Identify the applicable federal license or permit;
>
> (4) Identify the location and nature of any potential discharge that may result from the proposed project and the location of receiving waters;
>
> (5) Include a description of any methods and means proposed to monitor the discharge and the equipment or measures planned to treat, control, or manage the discharge;
>
> (6) Include a list of all other federal, interstate, tribal, state, territorial, or local agency authorizations required for the proposed project, including all approvals or denials already received;

(7) Include documentation that a pre-filing meeting request was submitted to the certifying authority at least 30 days prior to submitting the certification request;

(8) Contain the following statement: '*The project proponent hereby certifies that all information contained herein is true, accurate, and complete to the best of my knowledge and belief*'; and

(9) Contain the following statement: '*The project proponent hereby requests that the certifying authority review and take action on this CWA 401 certification request within the applicable reasonable period of time.*'

226. Section 121.5(c) includes the required contents of a certification request for a general license or permit, which shall:

(1) Identify the project proponent(s) and point of contact;

(2) Identify the proposed categories of activities to be authorized by the general license or permit for which certification is requested;

(3) Include the draft or proposed general license or permit;

(4) Estimate the number of discharges expected to be authorized by the proposed general license or permit each year;

(5) Include documentation that a pre-filing meeting request was submitted to the certifying authority at least 30 days prior to submitting the certification request;

(6) Contain the following statement: '*The project proponent hereby certifies that all information contained herein is true, accurate, and complete to the best of my knowledge and belief*'; and

(7) Contain the following statement: '*The project proponent hereby requests that the certifying authority review and take action on this CWA 401 certification request within the applicable reasonable period of time.*'

227.   Section 121.6 of the Certification Rule provides the procedure for a Federal agency to establish the reasonable period of time after receiving notice of the certification request. Once the reasonable period of time is established, it may only be extended by the Federal agency, and may never exceed one year from receipt of the certification request.

228.   EPA posited that the Certification Rule, "[b]y clarifying the timeframe for certifying authorities to act on certification requests," will result in "more predictability in the certification process, including certainty about when project proponents should expect a decision on a certification request." 2020 Economic Analysis at 22.

229.   EPA acknowledged in its Economic Analysis that due to a lack of data, it is "unable to estimate how many projects are delayed" by the current practice of certifying authorities requiring a "complete application." 2020 Economic Analysis at 15.

230.   Defendants' "clarification" of the timeframe consists of its restrictive definition of what constitutes a "certification request" sufficient to

trigger the start of the "reasonable period of time" in Section 401. *See* Certification Rule § 121.5.

231.   In the preamble to the final Certification Rule, Defendants claim that the Certification Rule will not result in more denials, because it does not "limit[] the ability of a certifying authority to collect additional information from a project proponent" and because it includes "a mandatory pre-filing meeting request, which will allow project proponents and certifying authorities to begin early conversations . . . ." Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. at 42,263

232.   At the same time, in its 2020 Economic Analysis, EPA agrees that "the list of information and materials required in a certification request is not an exhaustive list of materials that *may be necessary* to make a certification decision." 2020 Economic Analysis at 26 (emphasis added).

233.   Additionally, the 2019 Economic Analysis acknowledged that the restrictive definition of what constitutes a certification request "may lead to more denials." 2019 Economic Analysis at 15.

234.   Under the Certification Rule, after a denial, the project proponent is entitled to resubmit the certification request with the missing information, which will start another reasonable period of time. *See* Certification Rule § 121.8(a).

235.   Defendants fail to explain why a delay caused by this new process is preferable to the *status quo*: certifying authorities waiting until they receive a "complete application" prior to considering the certification request.

236.   In a survey of thirty-one states conducted by the Association of Clean Water Administrators, the average length of time states took to complete a certification after receipt of a complete application was 132 days, and results also showed that certification denials were rare. States cited the primary reason for delay as incomplete requests from project proponents. *See* Association of Clean Water Administrators, Comment Letter on Proposed Rule—Updating Regulations on Water Quality Certification (Oct. 21, 2019).

237.   Under the new regime of the Certification Rule, certifying authorities may be incentivized to immediately deny certification requests as soon as they realize that additional information is needed, in the hopes that the project proponent will re-submit a certification request with the missing information and the "reasonable period of time" will be re-set.

238.   This scenario is especially likely, as states and local governments informed Defendants during the rulemaking process that the proposed definition of "request" (which was substantially similar to §§ 121.5(b) and (c)) "does not include sufficient information for a certifying authority to make an informed

decision on a certification request." State & Local Gov't Consultation Summary at 6.

239.   States and local governments suggested that the Certification Rule refer back to state law, thus allowing states to promulgate their own implementing regulations. State & Local Gov't Consultation Summary at 7.

240.   This solution would have provided just as much clarity as §§ 121.5(b) and (c), and would avoid increased denials.

241.   Thus, Defendants offer an explanation for their decision to restrictively define "certification request" that runs counter to the evidence in the record. *See Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43.

242.   Without any evidence to support an assertion of reduced overall time spent for project proponents to obtain a certification (from initial request to final outcome), Defendants' decision to restrictively define what constitutes a "certification request" in § 121.5 and base the "reasonable period of time" on that definition in § 121.6 is arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), and is in excess of statutory authority, 5 U.S.C. § 706(2)(C).

*Section 121.9 of the Certification Rule Redefines "Waiver" to Include a Failure to Comply With Substantive Regulatory Requirements Contained in § 121.7, Allowing Federal Agencies to Substantively Review Certification Decisions and Conditions Contrary to the Clean Water Act's Statutory Language, Relevant Case Law, and Defendants' Own Reasoning.*

243.   Defendants state in the preamble to the final Certification Rule that, in contrast to the proposed Certification Rule, "the final rule does not require federal agencies to substantively evaluate or determine whether a certification action was taken within the scope of certification." Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. at 42,267.

244.   Defendants purportedly made this change based on "public comments and relevant court decisions." *Id.*

245.   Indeed, the Second Circuit has held that while a Federal agency "may determine whether the proper state has issued the certification or whether a state has issued a certification within the prescribed period," it "does not possess a roving mandate to decide that substantive aspects of state-imposed conditions are inconsistent with the terms of § 401." *Am. Rivers, Inc. v. Fed. Energy Regulatory Comm'n*, 129 F.3d 99, 110–11 (2d Cir. 1997).

246.   This ruling was based on § 401(d), which requires the federal agency to accept all conditions—they "*shall* become a condition on any Federal license or permit subject to the provisions of this section." 33 U.S.C. § 1341(d) (emphasis added).

247.   Defendant's final Certification Rule, however, allows a Federal agency to review a certification action to determine whether a "waiver" has occurred. *See* Certification Rule § 121.9.

248.   The Certification Rule defines waiver, in part, as the "certifying authority's failure or refusal to act on a certification request, including: (i) Failure or refusal to act on a certification request within the reasonable period of time; (ii) [f]ailure or refusal to satisfy the requirements of § 121.7(c); (iii) [f]ailure or refusal to satisfy the requirements of § 121.7(e); or (iv) [f]ailure or refusal to comply with other procedural requirements of section 401." Certification Rule § 121.9(a)(2).

249.   Section 121.9(b) also provides that a "condition for a license or permit shall be waived upon the certifying authority's failure or refusal to satisfy the requirements of § 121.7(d)."

250.   Section 121.7 of the Certification Rule delineates what constitutes an "action on a certification request" and states that "any action by the certifying authority to grant, grant with conditions, or deny a certification request *must be within the scope of certification*, must be completed within the reasonable period of time, and must otherwise be in accordance with section 401 of the Clean Water Act." Certification Rule § 121.7(a).

251.   Subsections (c), (d), and (e) of § 121.7 include the specific statements that must be included in a grant, a grant with conditions, or a denial of a certification request.

252.   Thus, § 121.9(a)(2) allows federal agencies to find a waiver where a certifying authority's action on a certification request does not comply with § 121.7, including its incorporation of the substantive "scope of certification" standard.

253.   This is end-run around the statutory text, which provides that:

> If [the certifying authority] fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been *waived as provided in the preceding sentence*.

33 U.S.C. § 1341(a)(1) (emphasis added).

254.   The Clean Water Act expressly dictates the circumstances under which Section 401 requirements are waived: when the certifying authority fails or refuses to act on a request for certification within the reasonable period of time. *See* 33 U.S.C. § 1341(a)(1).

255.   These circumstances include both an express waiver (refusal to act within the reasonable period of time) and an unintentional waiver (failure to act within the reasonable period of time).

256.   In defining an unintentional waiver, the Certification Rule takes a single concept—failing or refusing to act within a reasonable period of time— and splits it into two: (1) failing or refusing to act, *see* §§ 121.7, 121.9(a)(2)(ii)– (iv) and (2) failing or refusing to act within a reasonable period of time. *See* § 121.9(a)(2)(i).

257.   By doing so, Defendants have imposed a substantive element into a Federal agency's previously procedural determination of whether a waiver has occurred.

258.   Furthermore, the Clean Water Act provides no mechanism by which an individual condition within a certification can be "waived," which Defendants attempt to create in §§ 121.9(b) and 121.10(a).

259.   Defendants have "relied on factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, and exceeded their statutory authority in regulating what constitutes an "action on a certification request" and how a waiver is to be determined, therefore §§ 121.7, 121.9, and 121.10 of the Certification Rule violates the Clean Water Act, is in excess of

statutory authority, 5 U.S.C. § 706(2)(C), and is otherwise not in accordance with law, *Id.* § 706(2)(A).

*Section 121.11 Exceeds Defendants' Statutory Jurisdiction by Excluding Certifying Authorities from the Enforcement of Certification Conditions.*

260.  Section 121.11(c) of the Certification Rule provides that "[t]he Federal agency shall be responsible for enforcing certification conditions that are incorporated into a federal license or permit."

261.  This provision directly contradicts § 510 of the Clean Water Act, which preserves state, interstate agency, and local government authority to enforce "any standard or limitation respecting discharges of pollutants" and "any requirement respecting control or abatement of pollution" unless expressly provided for in the Clean Water Act, and as long as the standard, limitation, or requirement is as stringent as or more stringent than the Clean Water Act requires. 33 U.S.C. § 1370.

262.  Nothing in Section 401 precludes a certifying authority from enforcing the certification or its conditions.

263.  Thus, by making the Federal agency solely responsible for enforcing the Section 401 certification conditions, § 121.11(c) of the Certification Rule violates the Clean Water Act, is in excess of statutory jurisdiction, 5 U.S.C. § 706(2)(C), and is otherwise not in accordance with law, *Id.* § 706(2)(A).

*Section 121.12(b) of the Certification Rule Transforms a Mandate to Determine Whether a Discharge May Affect Water Quality in Another State Into a Discretionary Action by the Administrator, Contrary to the Plain Text of the Clean Water Act.*

264.   Section 121.12(b) of the Certification Rule states that, within thirty days of receiving notice of a Section 401 certification from a federal agency, the Administrator "*at his or her discretion* may determine that the discharge from the certified project may affect water quality in a neighboring jurisdiction."

265.   Section 401(a)(2) of the Clean Water Act makes clear that this determination is not discretionary. That provision requires, after the Administrator receives notification: "Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant." 33 U.S.C. § 1341(a)(2).

266.   The statute makes clear that the Administrator does not have the discretion to determine whether the discharge may affect water quality in other jurisdictions. The determination must be made, and if the discharge may affect water quality in another jurisdiction, then that jurisdiction must be notified.

267.   Accordingly, section 121.12(b) of the Certification Rule violates the Clean Water Act, is in excess of statutory authority, 5 U.S.C. § 706(2)(C), and is otherwise not in accordance with law, *Id.* § 706(2)(A).

71

*Section 121.12(c)(3) of the Certification Rule Erroneously Describes Conditions Imposed by Neighboring Jurisdictions as Certification Conditions, When the Clean Water Act Clearly Describes them as Conditions to the Federal License or Permit.*

268.   Section 121.12(c)(3) of the Certification Rule provides the procedures for a public hearing requested by a neighboring jurisdiction whose water quality may be affected by a proposed discharge.

269.   Subsections (iii) and (iv) provide that "the Federal agency shall . . . determine whether additional *certification* conditions are necessary to assure that the discharge from the *certified* project will comply with the neighboring jurisdiction's water quality requirements" and "[i]f additional *certification* conditions cannot assure that the discharge from the *certified* project will comply with the neighboring jurisdiction's water quality requirements, the Federal agency shall not issue the license or permit." Certification Rule § 121.12(c)(3)(iii)–(iv) (emphasis added).

270.   These provisions misstate the requirements of § 401(a)(2) by inserting a certification as a precondition to the additional conditions imposed on a Federal license or permit to protect the neighboring jurisdiction.

271.   Section 401(a)(2) states that the federal agency, "based upon the recommendations of [the neighboring jurisdiction], the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, *shall condition such license or permit* in such manner as may be necessary to insure

72

compliance with applicable water quality requirements." 33 U.S.C. § 1341(a)(2).

272.   Thus, even if the certifying authority waives certification and the Federal license or permit is "good to go" without a certification, § 401(a)(2) allows the Federal license or permit to include conditions based on the effect of the project on a neighboring jurisdiction's water quality.

273.   Accordingly, § 121.12(c)(3) of the Certification Rule violates the Clean Water Act, is short of statutory right, 5 U.S.C. § 706(2)(C), and is otherwise not in accordance with law, *Id.* § 706(2)(A).

**<u>The Certification Rule Violates the 10th Amendment.</u>**

274.   The Tenth Amendment of the United States Constitution reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

275.   To determine whether the Tenth Amendment has been violated, a court must determine "whether an incident of state sovereignty is protected by a limitation on an Article I power." *New York v. United States*, 505 U.S. 144, 157 (1992).

276.   The Clean Water Act was enacted as "a program of cooperative federalism" under Congress's Commerce Clause powers. *Id.* at 167 (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1984)).

277.   "The allocation of power contained in the Commerce Clause . . . authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." *Id.* at 166.

278.   The Clean Water Act offers states a choice: either take primacy over the regulation of water pollution control upon meeting minimum federal standards, or choose not to regulate and allow the Federal government to preempt state law. *See id.* at 167–68.

279.   Once a state has chosen to regulate, the Clean Water Act "provides a federal floor, not a ceiling, on environmental protection." *Dubois*, 102 F.3d at 1300.

280.   Accordingly, Congress explicitly preserved state authority to regulate more stringently than the EPA in Section 510 of the Clean Water Act:

> Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment

standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

33 U.S.C. § 1370.

281.  As another example of the Clean Water Act's acknowledgement of state authority under Section 401, § 511(c)(2)(A) prevents federal agency review under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h, of "the adequacy of any certification under section [401] of this title . . . ." 33 U.S.C. §1371(c)(2)(A).

282.  Sections 121.1(f), 121.1(n), and 121.3 of the Certification Rule violate the Tenth Amendment because they curtail states' ability to regulate an activity beyond the federal "floor" of the Clean Water Act's jurisdiction. *See* ¶¶ 182–223, *supra*.

283.  Sections 121.7, 121.9, and 121.10 violate the Tenth Amendment by subjecting state certifications to a substantive review and potential rejection by a Federal agency. *See* ¶¶ 243–259, *supra*.

284. Section 121.11(c) of the Certification Rule violates the Tenth Amendment by depriving states of the authority to enforce certification conditions that are based in state law. *See* ¶¶ 260–263, *supra*.

**The Certification Rule Will Harm Plaintiffs and Members of DRN.**

285. Plaintiffs bring this action on behalf of themselves and DRN's members who have interests in the waters of the Delaware River watershed, which have been made vulnerable to degradation under Defendants' Certification Rule.

286. The Certification Rule diminishes the previously broad scope of Section 401, a regulatory mechanism that allows certifying authorities to take a holistic approach in protecting water quality from the effects of Federally licensed or permitted projects.

287. This curtailment of regulatory authority creates a substantial risk that the Delaware River watershed will be subject to increased land cover change, deforestation, sedimentation and erosion, water quality degradation, stream degradation, wetland loss, and air emissions caused by Federally licensed or permitted projects, including, but not limited to, natural gas infrastructure development.

288. Plaintiffs fish, hike, boat, swim, wade, tube, run, camp, bike, birdwatch, and view wildlife in and near the waters of the Delaware River

watershed. Plaintiffs' substantial recreational interests are imminently and adversely harmed by the Certification Rule because it creates a substantial risk that these waters will be degraded by Federally licensed or permitted activities.

289.  Plaintiffs own real property, both residential and commercial, within the Delaware River watershed, the value of which depends on clean and healthy water resources. Plaintiffs' real property interests are imminently and adversely harmed by the Certification Rule because it creates a substantial risk that these water resources will be degraded by Federally licensed or permitted activities.

290.  Plaintiffs rely on the Delaware River watershed for their drinking water. Plaintiffs' access to clean drinking water is imminently and adversely harmed by the Certification Rule because it creates a substantial risk that water quality will be degraded by Federally licensed or permitted activities.

291.  Plaintiffs also have a procedural interest in the integrity of the Section 401 program, as it provides Plaintiffs with a comprehensive understanding of how Federally licensed or permitted projects will affect water quality within the Delaware River watershed, and allows Plaintiffs to participate in the certifying authority's pollution control efforts. Plaintiffs' procedural interests are imminently and adversely harmed by the promulgation of the Certification Rule because it unlawfully limits the scope of a certifying

authority's review of the water quality impacts of a Federally licensed or permitted activity, contrary to the Clean Water Act.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of the APA, 5 U.S.C. § 706(2)(A))

292.   Plaintiffs hereby repeat and incorporate by reference all of the above allegations, set forth in paragraphs 1 through 291.

293.   Under § 706(2)(A) of the APA, a reviewing court must set aside any final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

294.   The Certification Rule is arbitrary, capricious, and not in accordance with law for several reasons.

295.   First, Defendants failed to analyze the Certification Rule's potential effects on water quality, despite the Clean Water Act's mandate to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

296.   Second, Defendants failed to make a rational connection between the facts in the record and the decision to narrow the scope of Section 401 certifications in § 121.3 of the Certification Rule.

297.  Third, Defendants ignored the text of the Clean Water Act and Supreme Court precedent in deciding to narrow the scope of Section 401 certifications in § 121.3 of the Certification Rule.

298.  Fourth, Defendants' interpretation of the scope of Section 401 certifications in § 121.3 of the Certification Rule renders Section 401 of the Clean Water Act superfluous because it duplicates the scope of Section 402 of the Clean Water Act.

299.  Fifth, Defendants' definition of a "certification request" in § 121.5 of the Certification Rule which triggers the "reasonable period of time" in § 121.6 of the Certification Rule fails to address the problem of long review periods because it fails to ensure that certifying authorities will have the necessary information to grant or deny a certification on its merits, and because the Certification Rule will likely result in increased denials due to incomplete requests.

300.  Sixth, Defendants claim that the Certification Rule does not allow Federal agencies to substantively review certification decisions or certification conditions, but § 121.7 of the Certification Rule creates new substantive requirements for certification actions and conditions, while § 121.9 allows Federal agencies to find a "waiver" if the certification action or condition does not comply with § 121.7.

301. Seventh, Defendants transform a statutory mandate into a discretionary action by giving the Administrator a choice in § 121.12(b) of the Certification Rule whether to determine if a discharge may affect a neighboring jurisdiction.

302. Eighth, Defendants vest Federal agencies with the sole authority to enforce certification conditions in § 121.11(c) of the Certification Rule despite Congress's reservation of state authority to enforce pollution laws in § 510 of the Clean Water Act.

303. Ninth, Defendants describe conditions relating to the water quality of a neighboring jurisdiction as "certification conditions" in § 121.12, when § 401(a)(2) of the Clean Water Act describes these conditions as conditions on the Federal license or permit itself, without regard to the certifying authority's certification.

304. For these reasons, the Certification Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and should be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(A).

## COUNT II
## (Violation of the APA, 5 U.S.C. § 706(2)(C))

305. Plaintiffs hereby repeat and incorporate by reference all of the above allegations, set forth in paragraphs 1 through 304.

306.  Under § 706(2)(C) of the APA, a reviewing court must hold unlawful and set aside any final agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

307.  The Certification Rule is in excess of statutory jurisdiction and authority in several respects.

308.  First, Congress did not delegate to Defendants the authority to regulate beyond Defendants' own functions under Section 401, therefore, §§ 121.1–121.11 of the Certification Rule are in excess of statutory jurisdiction, authority, or limitations.

309.  Second, even if Defendants are authorized to regulate beyond their functions, the Certification Rule restrictively defines what constitutes a "certification request" in § 121.5, despite the fact that certifications are based on the regulatory requirements of the certifying authority. Thus, the Certification Rule hijacks a certifying authority's administration of the Section 401 program and exceeds Defendants' statutory jurisdiction.

310.  Third, even if Defendants are authorized to regulate beyond their functions, by adding substantive requirements to the definition of "action on a certification request," § 121.7, and using those requirements to determine when a waiver has occurred, §§ 121.9, 121.10, the Certification Rule exceeds Defendants' statutory authority.

311.   Fourth, even if Defendants are authorized to regulate beyond their functions, § 121.11 the Certification Rule exceeds Defendants' statutory jurisdiction by excluding certifying authorities from the enforcement of certification conditions, contrary to the express reservation of state authority in § 510 of the Clean Water Act.

312.   Fifth, Defendants exceed their statutory authority in § 121.12(b) of the Certification Rule by transforming a mandatory duty to determine whether a discharge may affect a neighboring jurisdiction into a discretionary action.

313.   The Certification Rule is short of statutory right for several reasons.

314.   First, even if Defendants are authorized to regulate beyond their functions, the Certification Rule narrows the scope of the Section 401 program in §§ 121.1(f) and 121.3 to regulate point source discharges only, despite the text of the Clean Water Act and Supreme Court precedent making clear that certifying authorities have the ability to review the Federally licensed or permitted activity as a whole.

315.   Second, even if Defendants are authorized to regulate beyond their functions, the Certification Rule narrows the scope of the Section 401 program in §§ 121.1(n) and 121.3 to applicable provisions of the Clean Water Act and state or tribal regulatory requirements for point source discharges, when the text of the Clean Water Act and Supreme Court precedent make clear that certifying

authorities have the ability to review the Federally licensed or permitted activity as a whole and condition the certificate based on a holistic view of its effects on water quality.

316. Third, § 121.12(c)(3) of the Certification Rule erroneously describes conditions imposed by affected neighboring jurisdictions as "certification conditions," when the plain language of the Clean Water Act describes them as conditions to the Federal license or permit not dependent on the certifying authority's certification.

317. For these reasons, the Certification Rule is in excess of statutory jurisdiction, authority or limitations, and is short of statutory right, and should be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(C).

## COUNT III
### (Violation of the APA, 5 U.S.C. § 706, and the Clean Water Act, 33 U.S.C. §§ 1251–1388)

318. Plaintiffs hereby repeat and incorporate by reference all of the above allegations, set forth in paragraphs 1 through 317.

319. Defendants' Certification Rule conflicts with the text of Clean Water Act at almost every turn, and ignores Supreme Court precedent based on a mistaken assumption that Court found Section 401 to be "ambiguous."

320. Defendants improperly narrowed the scope of a certifying authority's review in § 121.3 of the Certification Rule by defining "discharge,"

§ 121.1(f), and "water quality requirements," § 121.1(n), in a manner that is contrary to the plain text of the Clean Water Act and Supreme Court precedent interpreting those terms.

321.  The Certification Rule attempts to expand in §§ 121.7, 121.9, and 121.10(a) the circumstances under which waiver may be found by a Federal agency, contrary to specific language in the Clean Water Act providing that waiver only occurs upon a certifying authority's failure or refusal to act within a reasonable period of time, and Section 401(d)'s requirement that all conditions of a certification *shall* become a part of the Federal license or permit.

322.  Defendants attempt to prevent certifying authorities from enforcing their own certifications and conditions in § 121.11(c) of the Certification Rule by making Federal agencies solely responsible for enforcement, contrary to the Clean Water Act's § 510, which expressly preserves state authority to enforce pollution laws.

323.  The Certification Rule transforms a statutory mandate into a discretionary action in § 121.12(b), by making the Administrator's obligation to assess whether a neighboring jurisdiction is affected by a discharge an optional task.

324.  Finally, § 121.12(c)(3) describes conditions necessary to protect water quality in a neighboring jurisdiction as "certification" conditions, even

though the Clean Water Act makes clear they are conditions to the Federal license or permit and not dependent on the certifying authority's certification.

325.   For these reasons, the Certification Rule violates the Clean Water Act, 33 U.S.C. §§ 1251–1388, is not in accordance with law, is in excess of statutory jurisdiction, authority or limitations, and is short of statutory right, and should be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(A), (C).

### COUNT IV
### (Violation of the APA, 5 U.S.C. § 706, and the Tenth Amendment, U.S. Const., amend. X)

326.   Plaintiffs hereby repeat and incorporate by reference all of the above allegations, set forth in paragraphs 1 through 325.

327.   The Certification Rule violates the Tenth Amendment of the United States Constitution in three primary ways.

328.   First, §§ 121.1(f), 121.1(n), and 121.3 curtail the ability of states to regulate beyond the federal "floor" of the Clean Water Act's jurisdiction by narrowing the scope of Section 401.

329.   Second, §§ 121.7, 121.9, and 121.10 subject state certifications to a substantive review and potential rejection by a Federal agency.

330.   Third, § 121.11(c) deprives states of the authority to enforce their certification and conditions, which are based in state law.

331. Thus, the Certification Rule is contrary to constitutional right, power, privilege, or immunity, and should be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(B).

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request:

A. A declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that Defendants are each in violation of the Administrative Procedure Act, Clean Water Act, and the Tenth Amendment of the United States Constitution because the Certification Rule is: arbitrary, capricious, and otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; short of statutory right; and contrary to constitutional right, power, privilege, or immunity;

B. An Order vacating and setting aside the Certification Rule;

C. An award to Plaintiffs of reasonable attorneys' fees and expert fees in bringing and maintaining this action pursuant to 28 U.S.C. § 2412; and

D. An award to Plaintiffs of any other relief that the Court deems necessary or appropriate.

Respectfully submitted,

__/s/Deanna K. Tanner_____

Deanna K. Tanner, Esq. (Pa. Bar No. 60258)
Kacy C. Manahan, Esq. (N.J. Bar No. 275122018; Pa. Limited License)
*Pro Hac Vice* Admission Pending
**Delaware Riverkeeper Network**
925 Canal Street
7th Floor, Suite 3701
Bristol, PA 19007
215-369-1188 (Tel)
215-369-1181 (Fax)
deanna@delawareriverkeeper.org
kacy@delawareriverkeeper.org

*Attorneys for Plaintiffs*

DATED: July 13, 2020

# CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2020, I filed the original of the

foregoing Complaint with the Clerk's Office, and also served via First Class

Mail the parties below:

U.S. Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Office of the U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Environmental Protection Agency
Office of General Counsel 2310A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460


_/s/Deanna K. Tanner_____
Deanna K. Tanner, Esq. (Pa. Bar No. 60258)
Kacy C. Manahan, Esq. (N.J. Bar No. 275122018; Pa. Limited License)
*Pro Hac Vice* Admission Pending
**Delaware Riverkeeper Network**
925 Canal Street
7th Floor, Suite 3701
Bristol, PA 19007
215-369-1188 (Tel)
215-369-1181 (Fax)
deanna@delawareriverkeeper.org
kacy@delawareriverkeeper.org

*Attorneys for Plaintiffs*

DATED: July 13, 2020