**JEFF LANDRY**
  ATTORNEY GENERAL OF LOUISIANA
ELIZABETH B. MURRILL (*pro hac vice forthcoming*)
  *Solicitor General*
JOSEPH S. ST. JOHN (*pro hac vice forthcoming*)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov

**TIM FOX**
  ATTORNEY GENERAL OF MONTANA
JON BENNION (*pro hac vice forthcoming*)
  *Chief Deputy Attorney General*
215 N. Sanders, Third Floor
P.O. Box 201401
Helena, MT 59620
Tel: (406) 444-2026
jonbennion@mt.gov

SEE SIGNATURE PAGE FOR
ADDITIONAL PARTIES AND COUNSEL

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE RIVERKEEPER NETWORK, and the DELAWARE RIVERKEEPER, MAYA VAN ROSSUM, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and ANDREW R. WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency, <br><br> Defendants. | No. 2:20-cv-3412-MMB <br><br> **STATE INTERVENORS' MEMORANDUM ISO MOTION TO INTERVENE** |

**INTRODUCTION**

After decades of inaction by EPA and regulatory abuses by other states, Louisiana, Montana, and other states successfully sought EPA's clarification of regulations governing certifications under Section 401 of the Clean Water Act. Despite a clear statutory basis for those revisions, Plaintiffs seek to have the revised regulations set aside. The State Intervenors timely move to intervene to defend their sovereign interests and their hard-earned regulatory achievement.

**BACKGROUND**

THE CLEAN WATER ACT

Since 1970, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters . . . shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . ." Water Quality Improvement Act of 1970, Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3, 1970). In 1972, Congress enacted a "total restructuring" and "complete rewriting" of the nation's water pollution control laws, including that provision. *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (quoting legislative history). Of particular relevance here, Congress narrowed the requirement from a certification "that such *activity* will be conducted in a manner which will not violate applicable *water quality standards*," 84. Stat. at 108 (emphasis added), to a certification only "that any such *discharge* will comply with *the applicable provisions of sections 301, 302, 306, and 307 of this Act,*" 86 Stat. at 877 (emphasis added).

CERTAIN STATES ABUSE THEIR 401 CERTIFICATION AUTHORITY

Despite the statutory change, the Environmental Protection Agency ("EPA") failed to revise the regulations governing the required certification, which is known as a 401 Certification. As a result, EPA's regulations were incongruent with the new statutory language. *Cf.* NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, 32,856 (June 7, 1979) (indicating need for updated certification rules). As a result, EPA's regulations were incongruent with the new statutory language. Certain

states began using the incongruity and ambiguities in EPA's regulations to abuse their certification authority by delaying or denying certifications on grounds not contemplated by the Clean Water Act. In February 2019, Louisiana and other State Intervenors wrote to EPA Administrator Wheeler about that abuse and requested EPA "clarify[y] . . . the process by which federal and state regulatory authorities are expected to implement [Section 401]." Exh. 1. That weighty request was bolstered when, on April 10, 2019, the President issued an Executive Order noting that "[o]utdated Federal guidance and regulations regarding section 401 of the Clean Water Act . . . are causing confusion and uncertainty and are hindering the development of energy infrastructure" and directing Administrator Wheeler to review EPA's Section 401 regulations, "determine whether any provisions thereof should be clarified," and "publish for notice and comment proposed rules revising such regulations, as appropriate and consistent with law." EO 13868, 84 Fed. Reg. 15,494 (Apr. 15, 2019). Louisiana and other State Intervenors then submitted additional comments in response to EPA's request for Pre-Proposal Stakeholder Engagement. Exh. 2.

Louisiana identified the State of Washington's denial of certification for a proposed coal facility, the Millennium Bulk Terminal, as a paradigmatic example of abuse. Exh.1. The Governor of Wyoming later explained:

> Wyoming has been adversely impacted by the misapplication of other states' CWA Section 401 certifications. Our interest in a streamlined 401 certification process is founded by the fact that a large portion of Wyoming's economy depends on our ability to export our energy products to the markets that demand them, particularly markets located overseas in Asia. In the case of the Millennium Bulk Terminal, Washington State blocked the terminal's construction by inappropriately denying the State's Section 401 certification on account of non-water quality related impacts -- an illegal maneuver based on alleged effects that are outside of the scope of Section 401.[1]

Exh. 4. The permit applicant for the proposed Millennium Bulk Terminal elaborated:

> Millennium sought a Clean Water Act, Section 401 water quality certification from the Washington Department of Ecology ("Washington Ecology") for nearly six

---

[1] Letter from Governor Gordon to Administrator Wheeler (Oct. 21, 2019).

3

> years. As part of the 401 certification process, Millennium has spent over $15 million to obtain an environmental impact statement ("EIS"), which originally began as a dual EIS under the National Environmental Policy Act ("NEPA") and the Washington State Environmental Policy Act ("SEPA"), with the US Army Corps of Engineers as the lead agency under NEPA and with the Washington Ecology and Cowlitz County as co-lead agencies under SEPA. In September 2013, the state and federal agencies agreed to separate and prepare both a federal EIS and a state EIS.
>
> The state EIS concluded with respect to the Project that "**There would be no unavoidable and significant adverse environmental impacts on water quality.**"
>
> \* \* \* \* \*
>
> Washington Governor Jay Inslee, and others in his administration, including Washington Ecology Director Bellon, have expressed their belief that no fossil fuel infrastructure projects should ever be built in the State of Washington. Denying Millennium's 401 water quality certification was the way that they could impose their own personal policy preferences to ensure that no permits would be issued for the Project and they could stop sister states from exporting their products into foreign commerce.

Exh. 8.

Other comments and judicial opinions make clear the Millennium Bulk Terminal denial was not an isolated abuse. *See, e.g.*, Exh. 9. Indeed, the State of Maryland went so far as to seek a multi-billion dollar "payment-in lieu" of imposing unachievable conditions on a project that were unrelated to the discharge for which certification was sought – a demand that would ordinarily be considered extortionate and that raises constitutional concerns. Exh. 10; *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987). The Federal Energy Regulatory Commission bluntly summarized the status quo: "[I]t is now commonplace for states to use Section 401 to hold federal licensing hostage." *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019).

EPA ADOPTS A RULE TO ELIMINATE AMBIGUITY AND ABUSE

Citing Pre-Proposal Stakeholder Engagement and the April 2019 Executive Order, EPA published a proposed rule, Updating Regulations on Water Quality Certification, 84 Fed. Reg. 44,080 (Aug. 22, 2019), to, *inter alia*, limit the scope of 401 certification to water quality impacts from the discharge associated with the licensed or permitted project; interpret "receipt" and "certification

4

request" as used in the CWA; reaffirm that certifying authorities are required by the CWA to act on a request for certification within a reasonable period of time, which shall not exceed one year; and specify the contents and effect of a certification or denial. Despite the short text of the proposed rule itself—less than four *Federal Register* pages—EPA provided a lengthy statutory and legal analysis.

Louisiana, joined by other states, provided extensive comments in support of the proposed rule. Exhs. 1-3. The Governors of Wyoming and Oklahoma even testified before the Senate Committee on the Environment and Public Works in support of EPA's rule and parallel Congressional action. Thereafter, EPA published the final rule, Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210 (July 13, 2020). Plaintiffs filed their 88-page complaint the same day. Louisiana, Arkansas, Mississippi, Missouri, Montana, Texas, West Virginia, and Wyoming (collectively, "State Intervenors") now timely move to intervene in defense of the final rule.

## **LEGAL STANDARDS**

With respect to intervention as of right, "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). In the Third Circuit, an applicant seeking to intervene as of right must demonstrate that four requirements are met: "first, a timely application for leave to intervene; second, a sufficient interest in the litigation; third, a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action; and fourth, inadequate representation of the prospective intervenor's interest by existing parties to the litigation." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998). As a matter of policy, the Third Circuit favors intervention. *Id.* at 970.

5

With respect to permissive intervention, "[o]n timely motion, the court may permit anyone to intervene who. . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). Additionally, "the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on . . . a statute or executive order administered by the officer or agency." *Id.* at 24(b)(2). Thus, "[t]he requirements for permissive intervention are: (1) an independent basis of subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 333, 338–39 (E.D. Pa. 2004) (Dubois, J., citing *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998)).

## INTERESTS AND GROUNDS FOR INTERVENTION

**I.      The Court should grant intervention as of right.**

   **A.      The motion is timely.**

Plaintiffs filed their complaint only one month ago, and this litigation is in its earliest stages. *Cf. United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174, 1181 (3d Cir. 1994) (finding motion to intervene was timely even though filed over four years after litigation began). Defendants have not yet answered the complaint or submitted any other filings, and the proposed intervention poses no prejudice to the parties. Finally, the State Intervenors have not delayed the proceedings. Upon learning of the lawsuit, they quickly acted to form a coalition, meet and confer with all parties, and move for party status to protect their substantial interests. This motion is therefore timely. *See Mtn. Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995) (listing considerations for timeliness); *In re Domestic Drywall Antitrust Litig.*, 2016 WL 4409333, at *2 (E.D. Pa. Aug. 18, 2016) (Baylson, J., listing considerations for timeliness).

**B.     The State Intervenors have significant protectable interests, both as sovereigns and as advocates for the challenged rule.**

The State Intervenors have clear and substantial protectable interests at stake in this action: the "property" that is the subject of this action — particularly given Plaintiffs' request for nationwide relief — includes the sovereign lands and waters within the State Intervenors' borders; the scope of the State Intervenors' power and duty to regulate use of that property, including under the Clean Water Act; the scope and volume of litigation to which the State Intervenors are exposed from exercising those powers; and the State Intervenors' sovereign right to develop their natural resources without interference from other states. *See United States v. Oregon*, 745 F.2d 550, 551, 553 (9th Cir. 1984) (reversing denial of intervention where intervening state's natural resources "may be affected" by the litigation). Those interests are reinforced by the expansive interpretation of "waters of the United States" being sought in multiple co-pending cases, *e.g.*, *California v. Wheeler*, No. 3:20-cv-3005-RS (N.D. Cal.), and the unbounded construction Plaintiffs now seek for the "appropriate requirement of State law" portion of the certification requirement. Put directly, Plaintiffs seek to maintain State regulation of interstate commerce in excess of the authority delegated by Congress. And Plaintiffs' purpose for doing so is to foist their policy choices on the State Intervenors by indirectly regulating State Intervenors' development of their natural resources. *Cf. Commonwealth of Pennsylvania v. President of the United States*, 888 F.3d 52, 59 (3d Cir. 2018) ("Because our focus is on the 'practical consequences' of the litigation, we may consider any significant legal effect on the applicant's interest, including a decision's stare decisis effect or a proposed remedy's impact on the applicant for intervention."); *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) (abrogated on other grounds) ("By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court.").

7

In seeking to protect their sovereign interests through regulatory channels, State Intervenors advocated extensively for the challenged rule. *E.g.* Exhs. 1-4. Such advocates for regulatory action are "entitled as a matter of right to intervene in an action challenging the legality of a measure [they have] supported." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (collecting cases); *see also Pennsylvania*, 888 F.3d at 58 (finding significant protectable interest where intervenor had litigated issue and was described as "one impetus for change" of the regulation). Thus, in addition to their sovereign interests, the States Intervenor's regulatory advocacy is a protectable interest that entitles them to intervene to defend the rule for which they advocated.

### C. The disposition of this action could impede the State Intervenors' ability to protect their interests.

The risk this action poses to the State Intervenors' interests is readily apparent. Many of the State Intervenors asked EPA to revise its regulations because certain States were abusing their Section 401 Certification authority to delay and obstruct projects affecting other states for policy reasons unrelated to the Clean Water Act. Not surprisingly, the State Intervenors supported and continue to support EPA's promulgation of the clarified regulations to stop that abuse.

Plaintiffs seek to erase the State Intervenors' regulatory victory by way of this action. Plaintiffs claim the revised regulations are "arbitrary, capricious, and not in accordance with law" and "in excess of [EPA's] statutory authority." Compl. ¶¶ 163, 168, 181, 223, 242, 259, 263, 293, 294, 304, 307, 308, 317, 325. Plaintiffs then ask this Court to declare the regulations unlawful, set them aside, and vacate them. Compl. at p.86. Of course, if Plaintiffs obtain that relief, the consequences will extend to the State Intervenors, even though the State Intervenors support the revised regulations. And aside from intervening in this case to defend against the challenge, there is no ready recourse for the State Intervenors to combat the relief Plaintiffs seek.

**D.     The parties do not adequately represent the interests of the State Intervenors.**

**1.     Neither Plaintiffs nor EPA represent the interests of the State Intervenors.**

Unlike Plaintiffs, the State Intervenors believe the revised regulations are necessary to comply with the Clean Water Act. Regardless, the revisions are warranted to remedy abusive delays and obstructions imposed by certain States. To that end, the State Intervenors believe the revised regulations strike a reasonable and legally-correct balance between the States' sovereign powers and their obligation not to infringe the Commerce Clause, the sovereign rights of other states, and the Takings Clause rights of applicants for federal permits and licenses. Plaintiffs attacking is revised regulations clearly do not represent the State Intervenors' interests.

EPA does not represent the State Intervenors' interests, either. Although EPA will presumably urge the Court to reject the Complaint, its rationale may differ substantively from the bases the State Intervenors intend to advance. The State Intervenors' interests unquestionably differ from those of EPA when it comes to proper interpretation of the Clean Water Act's cooperative federalism framework. For example, State Intervenors contemplate arguing that an essentially unbounded definition of "appropriate requirement of State law" in the Clean Water Act would render the act unconstitutional, an argument EPA is unlikely to put forward. EPA also cannot respond to the Plaintiffs' arguments in the same manner the State Intervenors can: as distinct sovereigns in our federal form of government advocating on behalf of their own sovereign interests. And if the Court holds the revised regulations unlawful, Plaintiffs will necessarily obtain a remedy that will increase the power of the federal government and some States at the expense of other States, thereby imposing irreparable harms on the State Intervenors.

"In assessing the adequacy of representation, the focus should be on the 'subject of the action,' not just the particular issues before the court at the time of the motion." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001). The burden of showing inadequacy "is generally

'treated as minimal' and [only] requires the applicant to show 'that representation of his interest *may be* inadequate.'" *Pennsylvania*, 888 F.3d at 60 (quoting *Mtn. Top Condo.*, 72 F.3d at 368, itself quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). And although a government agency's representation is presumptively adequate, when, as here, the "agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light." *Pennsylvania*, 888 F.3d at 60-61 (quoting *Kleissler*, 157 F.3d at 972). The State Intervenors and their distinct sovereign and economic interests easily satisfy that standard. The same light burden also applies "when the government is charged with serving 'two distinct interests, which are related, but not identical.'" *Id.* at 61 (quoting *Trbovich*, 404 U.S. at 538). The State Intervenors satisfy that standard, too. EPA is charged with serving the distinct interests of clean water, federalism, and the economy, such that it could easily allow one interest to predominate, *i.e.*, precisely what Plaintiffs allege happened here.

### 2. The conduct of EPA and its employees compellingly reinforces that it is inadequate to represent the interests of the State Intervenors.

In addition to the EPA's legal inadequacy, certain past conduct leaves doubt that it could adequately represent the State Intervenors interests as a factual matter. EPA has repeatedly sought expansive interpretations of environmental statutes vis-à-vis the States. *See e.g.*, *Rapanos v. United States*, 547 U.S. 715, 722 (2006). And EPA has in the past achieved its own policy aims through "sue and settle" tactics, often at the expense of States, which its officials have openly acknowledged. In 2017, then-EPA Administrator Scott Pruitt frankly explained:

> In the past, the U.S. Environmental Protection Agency has sought to resolve litigation through consent decrees and settlement agreements that appear to be the result of collusion with outside groups. Behind closed doors, EPA and the outside groups agreed that EPA would take an action with a certain end in mind, relinquishing some of its discretion over the Agency's priorities and duties and handing them over to special interests and the courts. When negotiating these agreements, EPA excluded intervenors, interested stakeholders, and affected states from those discussions.

Exh. 7.

As the Third Circuit has recognized, environmental cases "frequently pit private, state, and federal interests against each other." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 971 (3d Cir. 1998). The Third Circuit thus recognized a real risk of collusive litigation actions that undermine adequacy of representation in such cases. *Id.* at 974. More broadly, where, as here, an agency undertakes an action only reluctantly and after delaying for years, it cannot be trusted to adequately represent the interests of those who advocated for the action. *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 899-900 (9th Cir. 2011) (reviewing cases). That EPA reportedly has internal resistance to the policies of elected leaders – like the revised regulations at issue – makes clear that EPA cannot adequately represent the Intervenor States' interests in defending those policies. *Cf. Kleissler*, 157 F.3d at 974 (finding inadequacy: "[I]t is not realistic to assume that the agency's programs will remain static or unaffected by unanticipated policy shifts.").

## II.     Alternatively, the Court should permit permissive intervention.

Even if this Court does not grant intervention as of right, the Court should permit the State Intervenors to intervene permissively pursuant Rule 24(b). Assuming the Court has jurisdiction, that jurisdiction is based on federal questions raised by Plaintiffs and the applicants for intervention do not assert additional claims; the requirement for an independent ground for jurisdiction does not apply. *Freedom from Religion Found. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). This application is timely for the reasons argued above. And the State Intervenors' position in support of the revised regulations plainly involves common questions of law and fact with this action, and their direct opposition to Plaintiffs' claims satisfies the "common question" requirement for permissive intervention. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1110 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1178, 1180 (9th Cir. 2011) (en banc). Moreover, the State Intervenors' experience with having development blocked by abusive 401

11

Certification practices will provide a "helpful, alternative viewpoint" to those offered by Plaintiffs that have lobbied in favor of those very practices, and EPA, which long-tolerated them, thereby "contribut[ing] to full development of the underlying factual issues and to the just and equitable adjudication of the legal questions presented." *Pickup v. Brown*, 2012 WL 6024387, at *4 (E.D. Cal. Dec. 4, 2012).

## CONCLUSION

For the foregoing reasons, the State Intervenors request the Court grant their motion to intervene as a matter of right under Rule 24(a) or, alternatively for permissive intervention under Rule 24(b).

Dated: August 28, 2020                    Respectfully submitted,

**FORD LAW OFFICE LLC**

/s/ Matthew C. Ford
WILLIAM E. FORD (Pa Bar No. 21872)
MATTHEW C. FORD (Pa. Bar No. 203990)
ERIC J. GASPAR (Pa Bar No. 208619)
FORD LAW OFFICE LLC
Two City Center
645 Hamilton Street, Suite 520
Allentown, PA 18101
Tel: (484) 273-0425
wef@flolegal.com
mcf@flolegal.com
ejg@flolegal.com

*Counsel for State Intervenors*

**JEFF LANDRY**
 **ATTORNEY GENERAL OF LOUISIANA**

ELIZABETH B. MURRILL (*pro hac vice* forthcoming)
 *Solicitor General*
JOSEPH S. ST. JOHN (*pro hac vice* forthcoming)
 *Deputy Solicitor General*
RYAN M. SEIDEMANN (*pro hac vice* forthcoming)
 *Assistant Attorney General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov
seidemannr@ag.louisiana.gov

*Attorneys for the State of Louisiana*


**TIM FOX**
 **ATTORNEY GENERAL OF MONTANA**

JON BENNION (*pro hac vice forthcoming*)
 *Chief Deputy Attorney General*
215 N. Sanders, Third Floor
P.O. Box 201401
Helena, MT 59620
Tel: (406) 444-2026
jonbennion@mt.gov

*Attorney for the State of Montana*

**LESLIE RUTLEDGE**
 **ATTORNEY GENERAL OF ARKANSAS**

NICHOLAS J. BRONNI (*pro hac vice forthcoming*)
 *Solicitor General*
VINCENT WAGNER (*pro hac vice forthcoming*)
 *Deputy Solicitor General*
OFFICE OF ARKANSAS ATTORNEY
 GENERAL LESLIE RUTLEDGE
323 Center Street, Suite 200
Little Rock, AK 72201
Tel: (501) 682-8090
nicholas.bronni@arkansasag.gov
vincent.wagner@arkansasag.gov

*Attorneys for the State of Arkansas*


**LYNN FITCH**
 **ATTORNEY GENERAL OF MISSISSIPPI**

KRISTI H. JOHNSON (*pro hac vice forthcoming*)
 *Solicitor General*
OFFICE OF MISSISSIPPI ATTORNEY
 GENERAL LYNN FITCH
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-5563
kristi.johnson@ago.ms.gov

*Attorney for the State of Mississippi*


**ERIC SCHMITT**
 **ATTORNEY GENERAL OF MISSOURI**

D. John Sauer (*pro hac vice forthcoming*)
 *Solicitor General*
OFFICE OF THE MISSOURI
 ATTORNEY GENERAL
P.O. Box 899
Jefferson City, MO 65102-0899
Tel: (573) 751-1800
john.sauer@ago.mo.gov

*Attorney for the State of Missouri*

**KEN PAXTON**
  **ATTORNEY GENERAL OF TEXAS**
JEFFREY C. MATEER
  *First Assistant Attorney General*
RYAN L. BANGERT
  *Deputy First Assistant Attorney General*
DARREN L. MCCARTY
  *Deputy Attorney General for Civil Litigation*

DAVID J. HACKER (*pro hac vice forthcoming*)
  *Associate Deputy Attorney General for Civil Litigation*
OFFICE OF THE TEXAS
  ATTORNEY GENERAL
P.O. Box 12548 (MC 001)
Austin, Texas 78711-2548
Tel: (512) 936-1700
david.hacker@oag.texas.gov

*Attorney for the State of Texas*


**PATRICK MORRISEY**
  **ATTORNEY GENERAL OF WEST VIRGINIA**

LINDSAY S. SEE (*pro hac vice forthcoming*)
  *Solicitor General*
State Capitol Building 1, Rm. 26-E
Charleston, WV 25305
Tel: (304) 558-2021
lindsay.s.see@wvago.gov

*Attorney for the State of West Virginia*


**FOR THE STATE OF WYOMING**

JAMES C. KASTE (*pro hac vice forthcoming*)
  *Deputy Attorney General*
WYOMING ATTORNEY GENERAL'S OFFICE
2320 Capitol Avenue
Cheyenne, Wyoming 82002
Tel: (307) 777-6946
james.kaste@wyo.gov

*Attorney for the State of Wyoming*